No. 95,800

STATE OF KANSAS, *Appellee*, v. PHILLIP D. CHEATHAM, JR., *Appellant*.

(292 P.3d 318)

Opinion filed January 25, 2013.

*Paul R. Oller*, of Oller, Johnson & Bittel, L.L.C., of Hays, and *John Val Wachtel*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause and were on the briefs for appellant.

*Jacqie J. Spradling*, chief deputy district attorney, argued the cause, and *Natalie Chalmers*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: In this capital murder case resulting from a double homicide and shooting of a third victim, Phillip D. Cheatham, Jr.

was convicted and sentenced to death. On direct appeal to this court, he claims he was denied his right to a fair trial due to ineffective assistance of counsel. Cheatham characterizes his trial attorney's performance as a "cornucopia of . . . ineptness" based on both performance deficiencies and conflict of interest.

We bifurcated his ineffectiveness arguments from other claimed trial errors and remanded to the district court for an evidentiary hearing pursuant to *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986) (appellate court discretion to remand ineffective assistance of counsel allegations upon sufficient showing in a direct appeal). During that proceeding, the State disputed that Cheatham received ineffective assistance during the guilt phase but stipulated Cheatham's attorney was ineffective during the trial's penalty phase. See K.S.A. 2010 Supp. 21-4624 (requiring a jury to first decide a defendant's guilt before reconvening to determine whether to impose the death penalty). The district court, which we refer to throughout this opinion as "the *Van Cleave* court," reversed the death sentence because of that stipulation and ordered a new sentencing trial.

As to the guilt phase, the *Van Cleave* court agreed with some of Cheatham's claims. It determined counsel was deficient in failing to file a statutorily required notice of alibi defense, as well as entering into an improper attorney fee agreement and generally lacking the experience required to try a capital murder case. The court went so far as to observe that Cheatham's attorney "had no business taking on a death penalty case."

But despite these findings, the court upheld Cheatham's convictions. It found there was no showing of "a reasonable probability that, but for those deficiencies . . . the outcome of the guilt phase would have been any different." Now before this court, Cheatham challenges several of the *Van Cleave* court's rulings and its ultimate conclusion. We disagree with the *Van Cleave* court.

We hold that trial counsel's representation denied Cheatham the fair trial he is guaranteed by both the federal and state constitutions. Specifically, we hold that counsel's performance was deficient in several respects, which were most seriously problematic when he volunteered to the jury that Cheatham had a prior vol-

untary manslaughter conviction and referred repeatedly to his client as a "professional drug dealer" and "shooter of people." This denied Cheatham his right to a fair trial. We hold further that under the circumstances in this case counsel's fee arrangement created an actual conflict of interest that adversely affected the adequacy of Cheatham's defense. We reverse his convictions and remand the case for a new trial. This renders the other issues on appeal moot.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying murder trial arose after the shooting deaths of Annette Roberson and Gloria Jones and the severe wounding of Annetta Thomas at a Topeka residence on December 13, 2003. Thomas told police officers at the scene that two men entered the residence, conversed for a while, and then drew handguns and began shooting. She said she knew one of the two shooters as "KP" or "Phil." She did not know the other man. "KP" was later identified as Cheatham.

Five days after the shootings, the State charged Cheatham with two counts of first-degree premeditated murder for the deaths of Roberson and Jones; one count of attempted murder and one count of intentional aggravated battery for shooting and then beating Thomas; and one count of criminal possession of a firearm. The State predicated the firearm's charge on Cheatham's 1995 voluntary manslaughter conviction.

Sometime after the shooting, but prior to his arrest, Cheatham telephoned Ira Dennis Hawver, a Kansas attorney, who at the time represented Cheatham on unrelated drug charges in Shawnee County. At the *Van Cleave* hearing, Hawver testified that Cheatham advised him during their telephone conversation that Cheatham was being accused of killing Roberson and Jones and shooting Thomas. Hawver said he responded by saying, "Well, you know, that's ridiculous because you're in Chicago and were headed that way."

Cheatham was arrested in Chicago on December 31 under a different name and for a different offense. He was eventually extradited to Kansas, where the public defender's office was initially

appointed to represent him. Two days after Cheatham's first appearance in district court, Hawver became counsel of record in the murder case at Cheatham's request, and the public defender's office withdrew.

At the time he accepted Cheatham's representation in this multiple murder case, which would soon transform into a capital murder proceeding, Hawver was a sole practitioner residing outside of Ozawkie, Kansas, in what Hawver described as a busy country law practice. Hawver estimated his legal business in 2005 as "high volume," comprising about 60 percent civil cases and 40 percent criminal. He said he appeared in area courts nearly every day. His criminal caseload consisted of both misdemeanors and felonies, such as burglaries, theft, and drug-related felonies. As he later testified, his practice ran "the gamut, whatever walked into the office."

Prior to accepting Cheatham's representation, Hawver had tried three noncapital murder cases—two as lead counsel and one as cocounsel. All three occurred before 1985—at least 20 years before Cheatham's capital murder trial. Hawver told the *Van Cleave* court that he had tried approximately 70 jury trials in his career but had never tried, or participated in the defense of, a death penalty case before accepting Cheatham's. Hawver was not on the list maintained by the Board of Indigents' Defense Services (BIDS) as a "death-qualified" private counsel, *i.e.*, an attorney specifically trained to defend capital cases under standards required by that agency. See K.A.R. 105-3-2 (any BIDS appointed attorney in capital case shall be a prequalified death penalty attorney). He was on the standard criminal case appointment list for Jefferson County but not Shawnee County, where Cheatham's case was filed.

Hawver agreed to Cheatham's representation knowing Cheatham did not have money to pay for Hawver's time or to reimburse expenses for investigators, consultants, expert witnesses, travel, photocopying, or the other substantial out-of-pocket costs usually associated with a capital murder case. Hawver later testified he never intended to use his own money to advance expenses on Cheatham's behalf. There was no written fee agreement.

Hawver also testified that Cheatham promised to pay a $50,000 attorney fee, but his testimony conflicts as to whether this was a flat or contingency fee. Early on, Hawver swore in an affidavit the fee would be owed only if Cheatham was acquitted, stating "I agreed to represent Mr. Cheatham on the murder charges in exchange for his promise to pay $50,000 for my time, *if he was found not guilty on the charges.*" (Emphasis added.) Later, Hawver recanted that statement and testified the $50,000 was owed regardless of the outcome. The *Van Cleave* court later observed in its decision that "[i]t is clear trial counsel had problems remembering [these] details." Regardless, Hawver acknowledged that Cheatham was indigent and he was unlikely to ever receive payment. Hawver testified that he agreed to represent Cheatham because of his "heart-felt belief" that Cheatham was innocent.

Hawver did not focus on Cheatham's case full time. He would later testify that he "had other things going on" during the 4 months leading up to Cheatham's scheduled trial, which led Hawver to have his client acknowledge in writing that Cheatham understood Hawver was not going to concentrate "full-time" on the case. Hawver said he explained to Cheatham that he was going to continue representing others in order "to earn a living" and also that he was running for political office, which is something Hawver had done in prior election cycles. At the *Van Cleave* hearing, Hawver and Cheatham's new counsel had the following exchange:

"Q.: Now, at the same time that you were preparing for this trial in that four-month period, you were running for governor as well; is that right?

"A. [Hawver]: Correct.

"Q.: In fact, you asked [Cheatham] to acknowledge that you were going to run for governor and that it was okay with him; is that right?

"A. [Hawver]: True. I wanted him to know that I had other things going on, and that he, you know, I wasn't going to be concentrating full-time on this case because I had to earn a living and I was running for governor.

"Q.: You were interested in that being acknowledged in writing, right?

"A. [Hawver]: Yes.

"Q.: And that was to protect yourself?

"A. [Hawver]: Well, no, I wanted him to know that what I was [d]oing and make the decision whether he wanted me to continue to represent him."

Hawver described his political activities to the *Van Cleave* court as a "hobby" that he engaged in as a "bully pulpit" to express disagreement with certain public policies, such as the Iraq war. Often, Hawver said, he would attend political events dressed in costume as Thomas Jefferson to reflect Hawver's views about the original underpinnings to the United States Constitution. As Hawver explained, these political and professional activities occupied a significant enough portion of his time that he wanted Cheatham to acknowledge they would coincide with the defense of the murder charges.

Cheatham agreed to Hawver's conditions, but there is nothing in the record to show that Cheatham understood the intense time commitments required for his defense due to the multiple murder charges and the death penalty sanction they carried. In other words, there is nothing demonstrating Cheatham was given an opportunity to appreciate what he was giving up in relation to what he would be getting, or to discuss with another attorney the ramifications of the choices he had. See *Boldridge v. State*, 289 Kan. 618, 624, 215 P.3d 585 (2009).

On June 24, 2005, the State amended its complaint to add one count of capital murder for the deaths of Roberson and Jones and, alternatively, a count of first-degree premeditated murder for each killing. The complaint continued to charge attempted murder and aggravated battery for the attack on Thomas and criminal possession of a firearm. A preliminary hearing was held from June 30 to July 7, 2005. Hawver was assisted at this proceeding by Bret D. Landrith, a Topeka attorney with little criminal case experience. Landrith's appearance at the preliminary hearing was the only assistance from outside counsel Hawver had during Cheatham's representation.

When Cheatham's preliminary hearing concluded, the district court found probable cause on all counts. The next day, the State filed a notice of intent to request a separate sentencing procedure and notice of aggravating circumstances as required for the State

to seek the death penalty under K.S.A. 21-4625. The State alleged as aggravating factors that Cheatham: (1) previously was convicted of voluntary manslaughter, a crime in which Cheatham inflicted great bodily harm, disfigurement, dismemberment, or death; (2) knowingly or purposely killed or created great risk of death to more than one person; and (3) authorized or employed another person to commit the crime.

At the *Van Cleave* hearing, Patricia Scalia, BIDS executive director, testified she contacted Hawver to inquire about Cheatham's representation shortly after the State amended the charges to seek the death penalty. BIDS is statutorily authorized to provide indigent defendants with resources to defend criminal charges, including capital cases. See K.S.A. 22-4501 *et seq.* Scalia informed Hawver about the services and assistance BIDS would provide in Cheatham's death penalty case, including furnishing cocounsel, investigators, consultants, and expert witnesses. Hawver confirmed to Scalia that Cheatham was indigent and qualified for BIDS services, but Hawver did not accept Scalia's offer of assistance. There was no further contact with BIDS regarding Cheatham's case prior to trial.

Hawver testified in the *Van Cleave* proceedings that he could not recall speaking with Scalia but conceded he did not seek financial assistance from BIDS because it was not his "practice to contact the Board of Indigent Defendants to ask them to fund a case" he had undertaken. He also testified that despite some knowledge of the appointment system for indigent criminal defendants, he "didn't even inquire" whether he could be appointed to represent Cheatham so that funds could be made available for the defense. And there is nothing in the record suggesting Cheatham knew about any of these available resources for his defense or that he knew Hawver had given up access to them.

In other pretrial proceedings, Hawver filed a motion for discovery and inspection, seeking all information held by the State regarding the crimes charged, including documents and photographs. Before trial, Hawver filed a notice to take a deposition to preserve the testimony of a Shawnee County jail inmate, whom Hawver claimed witnessed a confession by the husband of one of

the victims, claiming responsibility for the murders. The notice alleged the inmate had a malfunctioning pacemaker and the defense needed his testimony preserved. The State objected, arguing there was no concrete evidence the inmate would be unable to testify. In denying this motion, the district court found no evidence presented to show the witness' possible unavailability as required by K.S.A. 22-3211.

Hawver also filed a motion for an inquisition hearing to determine whether certain potential witnesses would invoke their Fifth Amendment right to remain silent. The record does not reflect whether this motion was ever heard or that Hawver followed up on it.

At another hearing about 2 weeks before trial, the State advised the district court that it was using Cheatham's prior voluntary manslaughter conviction to prove he was a convicted felon for the purposes of the criminal possession of a firearm charge. The State further advised it had sent Hawver a letter offering to stipulate during the guilt phase that Cheatham was a convicted felon so that the "nature of that prior conviction doesn't come before the jury because the courts have found that it can be more prejudicial than probative." The State also indicated Hawver had accepted that offer, and the State volunteered to draw up a written stipulation for all parties to sign. The court indicated the stipulation should be part of the official court record, and the State could "clean it up" by filing the stipulation. Hawver responded by stating, "[The State] will memorialize it." A written stipulation was never entered into the record, but, consistent with the State's offer, the jury instructions indicated the parties stipulated that "[t]he defendant had been convicted of a person felony on February the 14th, 1995."

Less than 1 week before trial, the State next moved to prevent Cheatham from presenting any alibi evidence other than his own testimony because Hawver had not filed a written notice of alibi defense as required by K.S.A. 22-3218. The State's motion was prompted when Hawver indicated to a prosecutor that Hawver intended to prove Cheatham was somewhere else at the time of the crime. K.S.A. 22-3218 requires a defendant charged with a crime that necessitates the defendant's personal presence, such as

the charges against Cheatham, to give the State at least 7 days' notice of any alibi defense, specifying where the defendant will claim he was at the time of the crime and identifying any witnesses supporting the alibi.

On the morning the trial commenced, the district court confirmed Hawver's failure to file the required notice. The court then held that Cheatham would be precluded from presenting alibi witnesses or other testimony about the subject, except from any testimony by Cheatham himself.

On August 29, 2005, jury selection began. Despite the stipulation offered by the State and accepted by Hawver to omit any reference to Cheatham's prior manslaughter conviction, Hawver told prospective jurors that Cheatham's lifestyle included being a cocaine dealer and that Cheatham had killed another cocaine dealer with a gun. Hawver turned to Cheatham to confirm the truth of those statements. Hawver repeated a similar characterization shortly thereafter. We discuss this in greater detail later in this opinion.

The trial's guilt phase lasted 9 days. Among the State's witnesses was Annetta Thomas, the lone survivor, who unequivocally testified Cheatham was one of the shooters. Under the State's prosecution theory, Cheatham killed the women in retaliation for stealing drug money from him. But Hawver argued that another man, Todd Adkins, who was Annette Roberson's boyfriend, killed the women because he was jealous of a lesbian affair between Roberson and Thomas.

Cheatham testified in his own defense and denied any involvement with the crimes. He maintained that he had left town at Hawver's suggestion and gone to Chicago on the afternoon of the day the crimes were committed. Importantly—and despite the State's stipulation—Hawver had Cheatham testify in detail about his prior voluntary manslaughter conviction. This testimony prompted the State on cross-examination to introduce exhibits—without objection from Hawver—depicting that victim's four gunshot wounds and exploring the crime in greater detail.

The jury found Cheatham guilty on all counts, and the proceedings turned to punishment. The penalty phase was conducted in a

single day. The State called one witness, the prosecutor from Cheatham's previous voluntary manslaughter case. The defense called two witnesses, Cheatham and his mother. The jury unanimously found all three aggravating circumstances alleged by the State and further found those aggravating circumstances were not outweighed by any mitigating circumstances. Under K.S.A. 21-4624(e), those findings mandate a death sentence.

Immediately after the jury announced its penalty phase verdict, Hawver advised the trial court that Cheatham wanted Hawver relieved and a new attorney appointed. The judge asked Cheatham to delay that request until after sentencing. Cheatham agreed. At the subsequent sentencing hearing, the district court imposed the death penalty consistent with the jury's verdict. In addition, the court sentenced Cheatham to 285 months for the attempted murder of Thomas, 43 months for the aggravated battery of Thomas, and 9 months for the criminal possession of a firearm. The sentences were to be served consecutively.

Hawver timely filed Cheatham's notice of appeal, and the district court allowed him to withdraw as Cheatham's counsel. The Capital and Conflicts Appeals Office assumed responsibility for Cheatham's appeal and began an investigation into whether Hawver's representation amounted to ineffective assistance of counsel. As a part of its investigation, Hawver executed an affidavit in which he admitted to doing—or failing to do—numerous things before and during Cheatham's trial that were deficient and prejudicial to Cheatham's defense effort.

In that affidavit, among other concessions, Hawver acknowledged that he only spent about 40 to 60 hours working on Cheatham's case during the 126 days between when he accepted the engagement and the first day of trial. He further stated:

"At the time I entered my appearance I did not consult with the BOARD OF INDIGENT[S'] DEFENSE to explore whether funding might be available to support my representation of the client. Nor did I meet with any person with experience in the pre-trial investigation of a capital case. *In truth, I should not have accepted the case given my lack of capital trial experience, and the unavailability of necessary funding which I now understand is required in the preparation and trial of cases, such as this one in which the client faces a possible death sentence.*" (Emphasis added.)

Hawver later added:

"I was not able to evaluate the strength of my theory of defense by employing an investigator and putting him into the field to question the scores of witnesses which may have had information to share about the day of the crime, the credibility of certain key witnesses, the relationship of my client with the Topeka police department and the resulting prejudice, the potential alibi witnesses or other critical evidence which would have [been] uncovered with the help of a competent investigator. *I admit that I did not provide effective assistance of counsel when I decided to forgo a comprehensive investigation of the trial facts.*" (Emphasis added.)

On direct appeal to this court, Cheatham's appellate counsel promptly sought remand to the district court for a hearing on Cheatham's ineffective assistance of trial counsel claims, which related to conduct during both the guilt and penalty phases. The State opposed this relief. This court determined the claim merited preliminary remand for a *Van Cleave* evidentiary hearing, which is the focus of our discussion below.

Prior to the *Van Cleave* hearing, the State stipulated that Cheatham received ineffective representation during the penalty phase based on four conceded errors. First, the State agreed Hawver "did not prepare for the sentencing phase of Mr. Cheatham's case" and admitted further that if he had prepared mitigation evidence it would have included character testimony from family members, evidence of parental neglect, maternal drug use, violence against his mother, poverty, and the absence of a father figure. The State acknowledged that forgoing the presentation of mitigation evidence would have been a reasonable trial strategy only if that decision were made after a reasonable investigation into mitigation evidence, citing *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

Second, the State stipulated that Hawver "did not attempt to secure funds to investigate a second phase, and had no defense team to assist in investigation or presentation of [the sentencing] phase defense." Third, it stipulated that Hawver neglected to qualify the jurors for the sentencing phase by failing to discover and remove any jurors who would automatically vote for the death penalty once they found Cheatham guilty in the first phase. And fourth,

the State stipulated that Hawver argued to the jury during the second phase that whoever committed the crime deserved to die.

The *Van Cleave* hearing regarding ineffectiveness during the guilt phase of the original trial was held on November 30, 2009. Cheatham presented three witnesses: Hawver, Scalia, and Charles Rogers, an expert on defense performance in death penalty cases. The State called no witnesses but cross-examined Hawver and Rogers. Cheatham was allowed to question Hawver directly.

In its order the *Van Cleave* court concluded that Hawver "had no business taking on a death penalty case." It also found there were "several areas where trial counsel's performance was deficient." But despite this, the court determined that Cheatham failed to establish Hawver's deficiencies sufficiently prejudiced the defense during the guilt phase. And regarding the penalty phase, the court held that Hawver was ineffective during the penalty phase and ordered a new penalty phase trial—consistent with the parties' stipulation.

New counsel was appointed for Cheatham, and his direct appeal to this court resumed. We ordered bifurcation of the ineffective assistance of counsel claims from the other issues in the appeal as authorized by K.S.A. 21-4627(d) (court may "enter such orders as are necessary to effect a proper and complete disposition of the review and appeal" in death penalty cases). We instructed the parties to brief only whether the *Van Cleave* court's decision on the ineffective assistance of counsel claim in the guilt phase was error. Additional facts are discussed as necessary to the arguments.

## ANALYSIS

Cheatham's brief asserts ineffective assistance of counsel arguments under both the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. Neither Cheatham nor the State suggests different standards apply for the state constitutional provision.

The Sixth Amendment guarantees in "all criminal prosecutions" that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." And this right to counsel is the right to the effective assistance of counsel. *Strickland v. Washington*,

466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); *State v. Gonzales*, 289 Kan. 351, 357, 212 P.3d 215 (2009); *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland*). In other words, to be meaningful the right to counsel necessitates more than a lawyer's mere presence at a proceeding. *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012). In addition, this constitutional right extends a duty of loyalty to the client. A defendant in a criminal trial must have " 'representation that is free from conflicts of interest.' " *Boldridge v. State*, 289 Kan. at 622 (quoting *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 [1981]). "The purpose of the effective assistance guarantee 'is simply to ensure that criminal defendants receive a fair trial.' " *Galaviz*, 296 Kan. at 174 (quoting *Strickland*, 466 U.S. at 689)]. This Sixth Amendment right to counsel is made applicable to state proceedings by the Fourteenth Amendment to the United States Constitution. 296 Kan. at 174.

The Kansas Constitution Bill of Rights, section 10, provides in pertinent part: "In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel. . . ." This court has previously applied *Strickland* as the "touchstone case" when a defendant alleged ineffective assistance of counsel under both the Sixth Amendment and the Kansas Constitution. *Ferguson v. State*, 276 Kan. 428, 436, 78 P.3d 40 (2003). Given this precedent, we will do the same because neither party in this case argues otherwise.

Ineffective assistance of counsel claims—whether based on deficient performance or conflict of interest—involve mixed questions of fact and law. *Boldridge*, 289 Kan. at 622. We review the *Van Cleave* court's underlying factual findings for support by substantial competent evidence and its legal conclusions based on those facts de novo. *Boldridge*, 289 Kan. at 622; *Gonzales*, 289 Kan. at 358-59.

In this case Cheatham alleges both deficient performance and conflicts of interest infected his trial. Claims of deficient performance may be analyzed differently than those based on conflict of interest. *Galaviz*, 296 Kan. at 177-78; *State v. Gleason*, 277 Kan. 624, 650, 88 P.3d 218 (2004) (citing *Mickens v. Taylor*, 535 U.S.

162, 168, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 [2002]). We consider first the deficient performance issues.

## DEFICIENT PERFORMANCE

Cheatham argues his trial counsel's deficient performance is demonstrated by Hawver's: (1) failure to meet the American Bar Association (ABA) standards established for death penalty representation; (2) lack of preparation time; (3) ignorance of capital murder litigation, failure to associate with learned counsel, and failure to obtain necessary training; (4) failure to adequately investigate witnesses and evidence; (5) failure to file the statutorily required notice of an alibi defense; and (6) introduction and discussion of Cheatham's prior voluntary manslaughter conviction during voir dire and closing argument.

### *Standard of Review*

In the deficient performance context, we have consistently said a criminal defendant must establish:

" ' "(1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." [Citations omitted.]' " *Robertson v. State*, 288 Kan. 217, 225, 201 P.3d 691 (2009) (quoting *Haddock v. State*, 282 Kan. 475, 512-13, 146 P.3d 187 [2006]).

This first prong requires a defendant to demonstrate counsel's representation fell below an objective standard of reasonableness, considering the entire circumstances attendant to the case. *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007). When applicable as it is in this case, one such circumstance is recognition that the allegedly deficient performance occurred in the context of a death penalty case. Nonetheless, judicial scrutiny of counsel's performance must be highly deferential and must make every effort to

"eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 283 Kan. at 90. We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance. 283 Kan. at 90.

As to the second prong, this court has repeatedly indicated that under *Strickland* the defendant must show prejudice by establishing a reasonable probability that the result would have been different without the deficient performance. And by this, the Court has explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We have accepted this guidepost in our prior caselaw. *Bledsoe*, 283 Kan. at 90; accord *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012); *Gonzales*, 289 Kan. at 358; *Robertson*, 288 Kan. at 225. The *Strickland* Court further described this inquiry as follows:

"An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. *The result of the proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.*" (Emphasis added.) 466 U.S. at 694.

In another portion of the *Strickland* decision, the Court explained: "[T]he defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*" (Emphasis added.) 466 U.S. at 687.

With this as the framework for our review, we consider each of Cheatham's deficient performance arguments next.

### ABA Guidelines

Throughout his brief, Cheatham argues the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) establish standards for an attorney defending a death penalty case, and that Hawver did not meet those standards. Cheatham then asserts his ineffective assistance

of counsel claim premised on the failure to comply with the ABA Guidelines and the argument that a failure to meet the ABA Guidelines amounts to deficient performance. We do not agree.

Ineffective assistance of counsel does not turn on what is "prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic*, 466 U.S. 648, 665, n.38, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) (A defendant may "make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel."). The United States Supreme Court has held that prevailing norms of practice as reflected in the ABA standards are "guides to determining what is reasonable, *but they are only guides.*" (Emphasis added.) *Strickland*, 466 U.S. at 688.

Without weighing in on the wisdom or propriety of following the ABA Guidelines, we decline to hold that they are coextensive with constitutional requirements. A failure to comply with the ABA criteria may be relevant in an evaluation into whether counsel's performance fell below an objective standard of reasonableness, but such failure is simply one circumstance to be considered—it is not by itself determinative. We summarize the ABA Guidelines relevant to Cheatham's arguments next, but in doing so we focus on the particular requirements to defend Cheatham's case and whether any failure to fulfill those requirements led to specific trial errors.

(1) *Hawver's lack of preparation time*

Cheatham claims Hawver's representation was deficient because he did not reduce his workload in order to provide Cheatham with high-quality legal representation. He cites ABA Guideline 10.3, which states: "Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines." Similarly, Cheatham claims Hawver violated Guideline 6.1, which instructs agencies representing indigent clients to "implement effectual mechanisms to ensure that the workload of attorneys representing defendants in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation . . . ." Cheatham asserts that

the typical attorney defending a capital case invests several thousand hours in the representation and argues the 200 total hours Hawver spent on Cheatham's representation, which included trial time, fell woefully short.

The *Van Cleave* court held "there is no evidence trial counsel's workload was unmanageable," even though Hawver maintained a full-time law practice and was running for political office while simultaneously preparing for Cheatham's trial. And it also declined to find error with Hawver's strategy of going to trial just 4 months after being engaged to defend Cheatham in order to "put pressure on the prosecution." The *Van Cleave* court found Hawver's lack of preparation time was neither deficient nor prejudicial.

We cannot as easily dismiss the limited time Hawver devoted to Cheatham's defense. This was a complex criminal trial by any measure, even before considering the added complications attendant to capital charges for murdering two people and attempting to murder a third. The State called 23 witnesses in its case-in-chief. But the limited time spent preparing for Cheatham's defense does not amount to a violation of Cheatham's right to effective counsel absent a showing of actual trial errors that prejudiced his defense. See *Cronic*, 466 U.S. at 666.

In *Cronic*, the defendant was indicted with two codefendants on federal mail fraud charges. His retained counsel withdrew shortly before the scheduled trial, and the court appointed a young real estate lawyer without any criminal law experience. The new lawyer was allowed only 25 days to prepare, in comparison to the 4½ years the Government had to investigate and prepare the case. Cronic's counsel did not put on any defense other than cross-examining the Government's witnesses, including the two codefendants who testified against Cronic.

The Supreme Court, reversing a decision by the Tenth Circuit Court of Appeals vacating the conviction, held that "[t]he right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. at 656. And a defendant can "make out a claim of ineffective assistance only by pointing to spe-

cific errors made by trial counsel." 466 U.S. at 666. It then upheld the conviction because no specific errors had infected the trial.

Although Hawver's lack of preparation time is obvious, our case-law requires it to be tied to specific trial errors and not considered on its own to be ineffective assistance of counsel.

(2) *Hawver's ignorance of capital murder litigation, failure to associate with learned counsel, and failure to obtain necessary training*

Similarly, Cheatham argues that capital defense litigation requires specialized knowledge and skill. He cites ABA Guideline 8.1, which instructs agencies responsible for approving appointments in capital cases to require attorneys seeking appointment to complete a rigorous training program that includes, among other things, training in relevant state, federal, and international law. Cheatham asserts Hawver's lack of death penalty experience infected Cheatham's trial because Hawver otherwise: (1) would have understood his inherent conflict of interest; (2) would have understood his duty to assemble a defense team and adequately investigate or present an alibi defense; (3) would not have introduced the prejudicial prior voluntary manslaughter conviction; and (4) would not have been unfamiliar with life-qualifying or death-qualifying the jury.

The *Van Cleave* court agreed that Hawver's representation was deficient because of his lack of experience in capital cases, stating:

"It never appears to have dawned on trial counsel to consult, much less affiliate, with other counsel for a capital case. He told Pat Scalia, of BIDS, that his client was indigent—in spite of a $50,000 fee. He never referred the case back to the Public Defender's Office once the capital charge was added. He never consulted with the Public Defender's Office or [BIDS] for any referral help or guidance in his, now, death penalty case. When contacted by Scalia and advised of the services available, trial counsel never took advantage of available services. Scalia states she thought there was a mistake, because she knew trial counsel was not on the list she maintained of death-qualified private counsel. He was not aware of the ABA Guidelines, which in an extensive format, were released in February 2003. (The first expansive ABA Guidelines were released in 1989.)"

The *Van Cleave* court went on to conclude that "[c]ounsel appears to have been completely unaware and made no attempt,

other than reading the law, to learn about handling a death penalty case as a reasonably effective counsel." The court then conceded it was "greatly concerned with trial counsel's approach."

But the court again declined to find Cheatham was prejudiced by this because, it said, Cheatham was simply speculating that Hawver's inexperience was what caused him to devise a trial strategy, for example, involving the introduction of Cheatham's prior conviction. It held further that Hawver's unfamiliarity with life-qualifying or death-qualifying the jury was not prejudicial to the guilt phase because Hawver was familiar with the facts, reports, and witnesses; and Hawver developed a plausible alternative theory for who committed the shooting.

Hawver's own testimony confirms the *Van Cleave* court's finding that his inexperience was problematic. During his deposition, Hawver testified:

"In truth, I should not have accepted the case, given my lack of capital trial experience and the unavailability of necessary funding, which I now understand is required [for] the preparation and trial of cases such as this one in which the client faces a possible death sentence."

Hawver's failure to familiarize himself with the requirements and resources available to assist with Cheatham's defense is distressing, if not professionally irresponsible. And it flies in the face of common sense that he so effortlessly dismissed the offer from the BIDS executive director to publicly provided assistance, which would have included furnishing cocounsel, investigators, consultants, and expert witnesses for his client's defense.

But as stated above, we must consider this inexperience in the context of specific trial errors claimed under *Strickland's* two-part test. *Cronic*, 466 U.S. at 666; *Flynn v. State*, 281 Kan. 1154, 1161, 136 P.3d 909 (2006); see also *Woods v. Sinclair*, 655 F.3d 886 (9th Cir. 2011), *vacated on other grounds* 132 S. Ct. 1819 (2012) (finding capital murder defendant's attorneys inexperience and caseload "troubling," but insufficient to establish ineffective assistance of counsel because defendant must point to "specific acts or omissions that may have resulted from counsel's inexperience and other professional obligations"). We address the claimed trial errors next,

except for the failure to life- or death-qualify the jury, which is unnecessary given our other holdings.

### (3) *Hawver's investigation of witnesses and evidence*

Again beginning with the ABA Guidelines, Cheatham argues Hawver had a duty to obtain the investigative resources necessary to prepare for both phases of Cheatham's trial and conduct a thorough and independent investigation into Cheatham's guilt. He argues Hawver did not meet those minimum requirements, citing a host of omissions including that Hawver did not hire a private investigator, interview witnesses, or attempt to verify Cheatham's alibi defense. The *Van Cleave* court declined to find most of these claimed errors amounted to ineffective assistance of counsel, finding instead the link between these failings and prejudice to Cheatham speculative.

The United States Supreme Court has discussed an attorney's failure to investigate a client's case on numerous occasions, including *Strickland*. In that case, the Court stated:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (Emphasis added.) 466 U.S. at 690-91.

Cheatham argues Hawver did not initially make a reasonable decision that would render a more particular investigation unnecessary. And while we will revisit some of these assertions again in the context of Cheatham's conflict of interest claim, we hold it is unnecessary to determine whether Hawver's performance was deficient in this regard because Cheatham fails to articulate a specific prejudice to the alleged deficiencies. Instead, in his brief to this court, Cheatham twice alleges simply that "prejudice must be presumed" without citing any authority to support that assertion.

There are limited circumstances when prejudice is presumed. See *Mickens*, 535 U.S. at 166 (prejudice presumed if counsel has

been actually or constructively denied during a critical stage of the proceeding); *Galaviz*, 296 Kan. at 177. But Cheatham has not alleged those circumstances, nor do we discern their applicability based on the record. Accordingly, we hold that Cheatham was required to demonstrate prejudice and failed to do so.

### Alibi defense

The *Van Cleave* court found that Hawver's failure to file the statutorily required notice of an alibi defense was deficient. It held this specific failure violated an objective standard of reasonableness because Cheatham's ability to present an alibi defense was "cut short" by the omission. But it held this error was not prejudicial because Cheatham's own testimony presented his alibi defense to the jury.

This court has previously held that counsel's failure to file the statutorily required notice of an alibi defense was deficient and prejudicial when the defendant's sole defense was alibi. *State v. Thomas*, 270 Kan. 17, 17, 11 P.3d 1171 (2000) (adopting the Court of Appeals opinion in *State v. Thomas*, 26 Kan. App. 2d 728, 731-32, 993 P.2d 1249 [1999]). In *Thomas*, the failure to file the notice prevented the defendant's sister from vouching for defendant's whereabouts when the crime occurred. The court held the sister's testimony could have created reasonable doubt in light of weaknesses in the State's case, even though she might have had a credibility problem because she was a family member. 26 Kan. App. 2d at 732.

We agree that Hawver's failure to file the statutorily required notice was deficient under the facts of this case. But Cheatham again makes no specific argument of prejudice and again incorrectly argues that prejudice should be presumed. Our review of the facts confirms the *Van Cleave* court's holding that no prejudice followed this error.

As noted by the *Van Cleave* court, "there is no one who can put the Defendant in Chicago, or on the way to Chicago on December 13, 2003, the date of these shootings." The court then detailed the specifics regarding each of the three witnesses who could be considered alibi witnesses and how their testimony or lack of availa-

bility would not support Cheatham's claims. In light of this evidence—or lack thereof—Cheatham has failed to establish prejudice. But in so deciding, we note the distinction between the failure to have these alibi witnesses available and Hawver's own potential to be an alibi witness, which is discussed in the conflict of interest section below.

*Prior manslaughter conviction and inflammatory characterizations*

Cheatham argues next that introduction of his prior voluntary manslaughter conviction, while simultaneously having his attorney repeatedly portray him to the jury as a "professional drug dealer" and "shooter of people," constituted ineffective assistance of counsel. He argues any "strategy" for making these declarations was based upon Hawver's misunderstanding of the law or misguided perception of what constituted a proper trial strategy and was prejudicial to his defense. Hawver exposed the jury to this disparaging information in three ways.

First, during jury selection, he told potential jurors about Cheatham's prior convictions for manslaughter and cocaine possession and then turned to Cheatham and had him verbally confirm these facts. Hawver then highlighted this disclosure by acknowledging that providing this damaging information "goes against all of the precepts of the average criminal defense lawyering [*sic*]." Second, during trial, Hawver had Cheatham describe in detail the shooting that led to the voluntary manslaughter conviction. This then opened the door for the State on cross-examination to show that Cheatham shot that victim four times—once in each arm and twice in the neck. The State was even able to show Cheatham an exhibit that displayed entry wounds to the victim, which was admitted without objection. Finally, during closing argument Hawver pointed out Cheatham's conviction again, stating, "My client has killed someone. My client is a dope dealer. My client is not a boy scout." And after making these remarks, he said, "I know that it is almost asking some sort of superhuman fiction for you all to not take into account Phillip Cheatham's background."

Hawver did these things even though the State had offered before trial simply to stipulate that Cheatham was a convicted felon

for the purposes of the criminal possession of a firearm charge so that the jury would not know that Cheatham was previously convicted of voluntary manslaughter or the details of that crime. And Hawver agreed to the stipulation by indicating that the State would "memorialize it" for the court. But presumably sometime between that hearing and trial, Hawver had a change of heart and decided to introduce the prior conviction himself.

The State argues that informing the jury of Cheatham's prior voluntary manslaughter conviction was not deficient because it was part of a strategy to be honest with the jury. And, citing the *Van Cleave* court's decision, the State speculates there was a possibility that Cheatham might have accidentally opened the door to this information while testifying in his own defense, so it was reasonable to share this information first. But the State also acknowledges "this strategy may . . . have been unusual." And more importantly, the parties and the *Van Cleave* court accept that the evidence was otherwise inadmissible—absent Hawver's decision to introduce it himself.

We agree the prior conviction would have been inadmissible during the guilt phase once the State took its relevance to the firearm charge off the table and conceded that admission of the crime's details could be more prejudicial than probative. And while we are not called upon to decide an admissibility question under K.S.A. 60-455, we note that its protections extended to Cheatham's case. The statute prohibited admission of prior crimes evidence for the purpose of proving a person's disposition to commit another crime unless the evidence is used to prove some other material fact, which the State's stipulation made unnecessary.

The statute's narrow rule is based upon recognition that prior crimes evidence can be more prejudicial than probative. See *State v. Boggs*, 287 Kan. 298, Syl. ¶ 2, 197 P.3d 441 (2008) (jury may exaggerate prior similar crimes as evidence that defendant likely committed current crime); *State v. Clements*, 241 Kan. 77, 84, 34 P.2d 1096 (1987) (prior crimes evidence cannot be used to infer defendant committed subsequent crime; evidence barred if its prejudice overbalances the rational development of the case); see also *State v. Terrazas*, 189 Ariz. 580, 584, 944 P.2d 1194 (1997)

(introduction of prior bad acts can "easily 'tip the balance against the defendant' "). The statute's purpose against admitting prior conviction evidence to show propensity was upended by Hawver's use of the voluntary manslaughter conviction at trial.

During the *Van Cleave* proceedings, Hawver gave conflicting explanations as to why he introduced details about the prior conviction. In a deposition prior to the evidentiary hearing, he testified that he informed the jury of the conviction because he believed the State would be able to introduce it during the guilt phase of trial because it was an aggravating factor the State would attempt to prove during the penalty phase. This misconception is evident by the following exchange:

"A. [Hawver]: Well, I made the decision that, in a sense, it was a capital case, and since the jury would be informed that he had done what he had to do in capital cases, unlawfully, feloniously, intentionally and with premeditation, kill more than one person, that's a capital murder requirement. Um, let's see. Um, where he would be — it would be stated that he had committed a crime that would bring him into the capital realm, I thought it was better to explain to them what the deal was rather than let them wonder what he had done.

"Q. [Cheatham's counsel]: And so if I understand you, please correct me if I misstate this, you understood that one of the aggravating factors that the state would attempt to prove if the penalty phase occurred was that Mr. Cheatham had on a prior occasion be convicted of this involuntary manslaughter?

"A. [Hawver]: *I thought they would be able to do that during the guilt phase, the guilt phase.*

"Q. [Cheatham's counsel]: And can you tell me under what theory you believed that evidence of involuntary manslaughter would have been admissible in the first phase?

"A. [Hawver]: The fact that it was a capital case.

. . . .

"A. [Hawver]: And in order to get a capital case, my understanding you have to have done something like that prior.

"Q. [Cheatham's counsel]: All right. *And so you believe that because they charged it as a capital case, that would give them the right to produce aggravating factors in the first phase of the trial?*

"A. [Hawver]: *Correct.*" (Emphasis added.)

Hawver then said he attempts to win cases by "telling the truth and letting the facts set, an understanding of the full scope of the presentation."

This testimony supports Cheatham's arguments on appeal because it suggests Hawver was confused or uninformed about the difference between the guilt and penalty phases of a capital murder trial. Our statute provides separate rules governing admission of evidence for these distinct phases in a capital murder case. See K.S.A. 21-4624(c) (any evidence the court deems probative may be received in the sentencing proceeding regardless of its admissibility under the rules of evidence). Had Hawver followed the State's stipulation, Cheatham's prior conviction would have been excluded during the guilt phase but admissible as an aggravating circumstance supporting a death sentence during the penalty phase, which would follow the jury's determination as to guilt.

But Hawver's testimony about why he disclosed the prior voluntary manslaughter conviction changed during the evidentiary hearing, so we must consider that complication as well. At the hearing, Cheatham's *Van Cleave* counsel attempted to elicit the same testimony from Hawver as quoted above from his deposition. And consistent with that deposition, Hawver initially answered in the affirmative when asked whether he thought "the State, by right, were going to have to prove the aggravating circumstances against Mr. Cheatham in the first stage of the trial." Then, Hawver modified his reasoning for ignoring the stipulation in the following exchange:

"Q. [Cheatham's attorney]: So that meant your understanding of the capital sentencing and the capital murder statute that you say you read, your understanding of that is that Mr. Cheatham, his manslaughter conviction was going to come in against him in the guilt/innocence phase of the trial, right?

"A. [Hawver]: I thought there was a possibility that the manslaughter conviction would come in during the first phase of the trial. That's why I made the decision, with [Cheatham's] concurrence . . . that we ought to tell them everything . . . ."

Again attempting to elicit the testimony given during the deposition, Cheatham's attorney asked Hawver whether he believed the State was going to admit the prior voluntary manslaughter conviction as part of the State's aggravating factors in the guilt phase.

And Hawver then responded, *"No, I thought they would bootleg it in.* I thought it would come in one way or the other." (Emphasis added.)

In reaction to that new explanation, Cheatham's attorney tried to impeach Hawver with the deposition transcript, but Hawver again modified his testimony by indicating he considered the aggravating factors to be the two murders and the repeated shooting, omitting from the list Cheatham's prior conviction—the third aggravating factor in the State's case for imposition of the death penalty. Hawver then testified that he "knew [he] had a right" to keep the voluntary manslaughter conviction out of the guilt phase, but he "thought it would come in somehow. I didn't know how. *I thought they would try to bootleg it in and be successful at doing so."* (Emphasis added.) Finally, Hawver reiterated his strategy of being honest and completely up-front with the jury "so that they would believe [Cheatham]."

Now based primarily on Hawver's deposition testimony, Cheatham argues that Hawver's trial strategy was a misunderstanding of the law and therefore deficient. The State ignores Hawver's deposition testimony and focuses on the testimony at the *Van Cleave* hearing that Hawver believed the State would bootleg the prior conviction into the guilt phase. And from that, the State argues Hawver did not pursue this strategy from a misunderstanding of the law.

The *Van Cleave* court did not resolve the conflicting testimony and seemingly accepted both of Hawver's explanations because it found "[i]t is not clear why or how trial counsel believed '[the conviction] would come in anyway.' " It further found Hawver "admits confusion about evidence in the guilt and penalty phases," which refers to Cheatham's argument that Hawver did not understand the State did not need to prove aggravating factors during the guilt phase. And the *Van Cleave* court also noted Hawver's explanation that the State would attempt to bootleg the conviction into evidence but then held that "trial counsel was also aware that any testifying defendant runs the risk of 'opening the door' to prior conviction history." Ultimately, the court characterized Hawver's

strategy as bold and risky and then twice repeated that it was not "per se deficient."

We hold the *Van Cleave* court erred to the extent it justified Hawver's actions as "strategy" based upon the risk that Cheatham would open the door through his own testimony because Hawver never asserted that as a reason. The *Van Cleave* court attributed this justification to Hawver absent evidence in the record. We also hold the *Van Cleave* court applied the wrong legal standard when it considered whether admitting the conviction was "per se" deficient. The issue for that court was whether voluntary disclosure of these particular facts surrounding the prior conviction was deficient under the circumstances in this case. And we find that it was deficient because it was a highly risky gambit that, at worst, was based upon a misunderstanding of the law, or, at best, nonsensical as evidenced by the contradictory explanations.

The record supports the *Van Cleave* court's first finding that Hawver misunderstood the difference between the evidence admissible during the trial's guilt and penalty phases. This is most evident through Hawver's deposition testimony in which he explicitly said he believed the State would be permitted to introduce the prior conviction by virtue of this being a capital case.

Two of our prior decisions finding counsel's misunderstanding of the law are analogous because those misunderstandings were similarly damaging to the defendant in some way. In *State v. Logan*, 236 Kan. 79, 689 P.2d 778 (1984), we held the defendant's credibility was impaired by his attorney's advice to admit on direct examination prior convictions involving dishonesty, which was based on an incorrect understanding of the law, because those admissions allowed the State to cross-examine him on a prior conviction for a similar crime. Similarly, in *State v. Rice*, 261 Kan. 567, 932 P.2d 981 (1997), applying *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984), this court held that counsel's advice that the defendant not testify at trial was deficient because it was not based on a correct understanding of law or any justifiable strategic considerations. See also *Wilkins v. State*, 286 Kan. 971, 982, 190 P.3d 957 (2008) (stating the "[m]ere invocation of the word 'strategy' does not insulate the

performance of a criminal defendant's lawyer from constitutional criticism").

Noting that the *Van Cleave* court did not challenge the credibility of Hawver's deposition testimony, we hold that Hawver's performance was deficient because he mistakenly believed the State could introduce the prior voluntary manslaughter conviction because it was an aggravating factor for the penalty phase. That misguided plan was based on an obvious misunderstanding of the law, and it cannot be excused as justifiable trial strategy in this circumstance.

We further find Hawver's second explanation that he was concerned the State might "bootleg" the conviction into evidence equally untenable. First, the State contacted Hawver, acknowledged that the prior conviction was inadmissible, and offered to stipulate that he had a prior felony for the purposes of the gun charge to avoid admitting the prior conviction. In doing so, the State made a sincere effort to follow the Kansas rules of evidence. It is mere speculation to argue this was some sort of prosecutorial bait-and-switch tactic. Second, Hawver admits the State risked a mistrial if it suddenly changed course during trial and attempted to admit the prior conviction. And third, while there is sometimes a risk that trial events will result in admission of prior convictions, any risk must be weighed against the potential prejudice that admitting a prior conviction for a similar crime has. We can find no justification in the record for assuming such a significant risk, which our statutes carefully seek to avoid, especially in light of the surviving victim's testimony identifying Cheatham as the shooter in this case.

Finally, the State argues that Cheatham consented to this defense approach, so Hawver should be relieved of responsibility for having chosen a deficient approach in the first place. But in *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972), this court held that technical and professional decisions that require training, skill, and specialized judgment must rest with the lawyer and that the lawyer, after consulting with the client, has exclusive control over decisions as to what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what

trial motions should be made, and all other strategic and tactical decisions. See also *Thompson v. State*, 293 Kan. 704, 716, 270 P.3d 1089 (2011); *Bledsoe*, 283 Kan. at 92.

We hold that Hawver's "strategic" decision to disclose damaging facts that did not need to be exposed was within the exclusive province of trial counsel and the responsibility for such decisions that are not objectively reasonable cannot be passed off to the client or otherwise excused as the State argues. On this claim, Cheatham's claim has much in common with *Bledsoe*. We hold the *Van Cleave* court erred by relying too heavily on deference to a trial "strategy" that on closer examination had no justifiable basis in reflection, research, or experience. Hawver's actions in this regard were deficient, which leads us next to consider prejudice.

The *Van Cleave* court found Cheatham failed to establish prejudice resulted from disclosing this information because, it noted, Hawver specifically elicited a promise from potential jurors during voir dire that they would not consider it in deciding Cheatham's guilt. And with respect to the voir dire specifically, the district court found no prejudice because all potential jurors who indicated any difficulty with the prior crimes information were removed from the panel during the selection process. We disagree with the *Van Cleave* court's conclusion that this excuses the deficient performance. These errors, standing alone, were so prejudicial they denied Cheatham his right to a fair trial.

Prior conviction evidence can be very damaging, especially in cases like this when there are similar crimes being charged. As we have previously explained, a jury may easily exaggerate the value of the prior crime and conclude because it is similar that the same defendant committed the one in question. Or, a jury might simply conclude the defendant deserves punishment because he was a wrongdoer in the past. Finally, the jury might conclude that because of the defendant's past acts, the evidence on his behalf should not be believed. *Rice*, 261 Kan. at 594 (quoting *State v. Peterson*, 236 Kan. 821, 828, 696 P.2d 387 [1985]). This court has required reversal in some cases when the State introduces such evidence. See *State v. Torres*, 294 Kan. 135, 143-54, 273 P.3d 729 (2012) (reversible error when State introduced prior conviction for

indecent liberties with a child at rape trial). See also *Stone v. State*, 17 S.W.3d 348, 352-53 (Tex. App. 2000) (no reasonably competent attorney would believe admitting prior murder conviction during examination of defendant at trial for drugs was sound trial strategy); *People v. Ofunniyin*, 114 A.D.2d 1045, 495 N.Y.S.2d 485 (1985) (reversible error where trial counsel, after securing exclusion of prior drug conviction, questioned defendant about it on direct examination).

Underscoring the magnitude of this disparaging information and its likely impact is Hawver's closing argument during which he conceded that asking the jury to ignore Cheatham's background when determining guilt required *"some sort of superhuman fiction."* (Emphasis added.) We agree. And coupled with Hawver's inflammatory characterizations of his own client to the jury, our confidence in the outcome of the jury's verdict is shaken to its core. These particular errors cannot be excused and require a new trial.

## CONFLICT OF INTEREST

Cheatham next argues the fee agreement Hawver entered into with him demonstrates ineffective assistance of counsel because it fostered one or more conflicts of interest that adversely affected Hawver's representation. Specifically, Cheatham claims the unwritten fee agreement was contingent on acquittal, which is per se unethical. In the alternative, Cheatham argues that if the fee agreement is viewed as a flat fee, the circumstances under which it was entered provided a financial disincentive for Hawver to actively investigate or promote Cheatham's defense and further denied Cheatham the ability to use Hawver as a supporting alibi witness. In other words, Cheatham contends the alleged conflict of interest arose because Hawver's personal or business interests were contrary to Cheatham's and that conflict adversely affected Hawver's representation of Cheatham.

### What test governs Cheatham's claim?

We begin by addressing what test governs Cheatham's claim. We conclude that Cheatham has alleged a conflict of interest and apply the "*Sullivan* standard" announced in *Cuyler v. Sullivan*, 446

U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). To apply that test in order to address the parties' arguments, we must determine: (1) what type of fee agreement Hawver and Cheatham entered; (2) whether it created a conflict of interest; and (3) whether that conflict adversely affected Hawver's performance.

The district court viewed this question differently as relating only to deficient performance and found the fee agreement deficient. Using the ABA Guidelines as the prevailing norms, the *Van Cleave* court concluded: "It is clear [Hawver] was not aware of, and did not follow, the ABA Guidelines regarding fees in this matter." And having made that determination, the district court then considered whether that failing—characterized as a deficient performance claim—prejudiced Cheatham. The district court concluded he was not prejudiced, stating:

"The Defendant does not offer any evidence as to how the Defendant was prejudiced by this deficiency. The Defendant's position appears to be that because the ABA Guideline was not met, there is prejudice. Trial counsel was familiar with the facts, witnesses and reports in this case. He was able to develop and present a plausible alternative theory as to who committed these shootings. *The Court finds that the Defendant has not shown that there is a reasonable probability that, but for any error regarding the fee structure in this case, the outcome of the guilt phase would have been any different.*" (Emphasis added.)

We must determine whether the *Van Cleave* court used the appropriate test because as discussed below the United States Supreme Court has held that at least some ineffective assistance of counsel claims based on a conflict of interest are determined using a different standard than those alleging deficient performance. *Strickland,* 466 U.S. at 692; *Boldridge,* 289 Kan. at 622-23; *State v. Gleason,* 277 Kan. 624, 650, 88 P.3d 218 (2004). We address first whether the *Strickland* standard should apply to this claim.

When the defendant alleges conflicts of interest arising from multiple concurrent representations and there was no trial objection, the United States Supreme Court has held that a criminal defendant must establish: (1) the existence of an actual conflict of interest between attorney and client; and (2) that the established conflict adversely affected the adequacy of the attorney's representation. *Sullivan,* 446 U.S. at 348-49; *Mickens v. Taylor,* 535 U.S.

162, 168, 152 L. Ed. 2d 291, 122 S. Ct. 1237, *reh. denied* 535 U.S. 1074 (2002) (citing *Sullivan*); see also *Boldridge*, 289 Kan. at 622-23; *Gleason*, 277 Kan. at 644-45. But in *Mickens*, the United States Supreme Court left open whether the *Sullivan* rule applies when the conflict alleged does not involve multiple concurrent representations.

In *Mickens*, the defendant alleged a conflict of interest based upon a successive representation. The Court applied the *Sullivan* standard in *Mickens* because "[t]he case was presented and argued on the assumption that (absent some exception for failure to inquire) *Sullivan* would be applicable." 535 U.S. at 174. And it noted that the parties' assumption that *Sullivan* applies was not unreasonable given the federal Court of Appeals' unblinking application of it to all kinds of alleged attorney conflicts, including when the representation implicates counsel's personal or financial interests. 535 U.S. at 174 (citing *United States v. Hearst*, 638 F.2d 1190, 1193 [9th Cir. 1980]).

But the *Mickens* Court warned future litigants that the language and rationale underlying *Sullivan* does not necessarily support its application to other types of conflict of interest claims. And it held it was an open question whether "*Sullivan* should be extended to [successive representation] cases." *Mickens*, 535 U.S. at 174-76; see also *Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (Application of the *Sullivan* rule outside of concurrent, multiple representation cases is not clearly established under Supreme Court decisions.).

Applying *Mickens*, our court recently summarized the framework for addressing a conflict of interest claim in *State v. Galaviz*, 296 Kan. at 183-84. *Galaviz* involved a successive representation claim, and this court noted that *Mickens* left open whether successive, personal, or financial interest claims were governed by the *Sullivan* standard. See *Galaviz*, 296 Kan. at 184 (discussing the "*Mickens* reservation"). Like the *Mickens* Court before it, this court in *Galaviz* did not decide the question, opting instead to use the "more lenient" adverse effect standard advocated by the parties. We held:

"We need not determine whether the adverse effect exception is the appropriate exception to be applied post-*Mickens* to successive representation situations because in this case the State does not argue any other test should be applied. Furthermore, like Mickens, in theory, Galaviz benefitted from this treatment by not being required to meet the more difficult *Strickland* test that requires a showing that counsel's performance resulted in prejudice, which is determined by examining whether the deficient conduct affected the outcome of the proceeding. [Citation omitted.]" *Galaviz*, 296 Kan. at 192.

The State has argued that we should apply the adverse effect test to Cheatham's alleged conflict of interest claims, and we will do so for the same reasons cited in *Galaviz*. And on that basis, we conclude the *Van Cleave* court erred by reviewing this claim solely under the *Strickland* standards. Accordingly, we must determine whether the district court's failure to address whether a conflict of interest actually existed under the facts as outlined above requires us to remand the case for review under the appropriate standard.

We faced a similar problem in *Gleason* and *Jenkins* when the ineffective assistance allegations were based upon a claimed conflict of interest that was not considered by the trial court. We found in both that we had sufficient evidence to make the necessary legal determinations under our standard of review and remand would serve no useful purpose. *Gleason*, 277 Kan. at 649-50; *State v. Jenkins*, 257 Kan. 1074, 1080, 898 P.2d 1121 (1995).

And as with *Gleason* and *Jenkins*, we have carefully reviewed the *Van Cleave* court's decision and the case record. We have determined that all facts necessary for resolution of Cheatham's conflict of interest arguments are contained in the record before us, and many necessary findings were made by the *Van Cleave* court in its *Strickland* analysis. Therefore, we hold that remand would serve no useful purpose.

We consider next whether Cheatham has demonstrated ineffectiveness based upon a conflict of interest that adversely affected the adequacy of Hawver's representation in this case. We rule that he has.

*What type of fee agreement governed Hawver's representation of Cheatham?*

As noted above, the evidence conflicted whether the fee was contingent on Cheatham being acquitted. In his affidavit, Hawver

swore under oath that the fee arrangement with Cheatham was contingent on acquittal. But in a later deposition, also taken under oath, Hawver disavowed that statement, and attempted to explain away the affidavit as simply a document drafted by Cheatham's appellate counsel.

Notably, Hawver also acknowledged that an ethics complaint was pending against him with the Office of Disciplinary Administrator as a result of the earlier affidavit because contingent fee agreements under these circumstances are prohibited. KRPC 1.5(f)(2) (2011 Kan. Ct. R. Annot. 471-72) ("A lawyer shall not enter into an arrangement for, charge, or collect . . . a contingent fee for representing a defendant in a criminal case.").

At the *Van Cleave* hearing, Hawver repeated his denial that the fee agreement was contingent on Cheatham's acquittal. He insisted the engagement was for a flat fee and declared that Cheatham still owed him the $50,000. And faced with these inconsistencies in Hawver's sworn testimony, the *Van Cleave* court found: "The likely answer is that there was no contingency fee arrangement." Later in its decision, the court with more certainty stated: "There is *no evidence* of a contingency fee agreement. The only evidence is that trial counsel would represent [Cheatham] for $50,000." (Emphasis added.)

These findings contradict themselves. On the one hand, the *Van Cleave* court speculates about how the conflict in evidence should be resolved; while on the other hand, the district court declaratively states there is "no evidence" whatsoever of any contingent fee arrangement. This latter finding cannot be correct because the affidavit stated that an unwritten contingent fee agreement existed and that one of its provisions was that $50,000 would be due "if [Cheatham] was found not guilty on the charges.".

Our first question consequently is whether there is substantial competent evidence to support the *Van Cleave* court's factual finding that there was not a contingency fee arrangement. See *Ferguson v. State*, 276 Kan. 428, 445, 78 P.3d 40 (2003) (district court's fact findings regarding an ineffective assistance of counsel claim must have substantial support in the evidence). And as to this, despite the inherent contradiction in the district court's discussion

about the fee agreement, we hold the record supports the *Van Cleave* court's finding that Hawver entered into a flat fee agreement with Cheatham.

Put simply, Hawver gave conflicting testimony and the *Van Cleave* court believed one version. The district court's factual determination that there was a flat fee agreement is supported by substantial competent evidence. This resolves Cheatham's first issue with the fee arrangement in the State's favor. But that does not put to rest the conflict claim.

*Did the flat fee agreement create a conflict that adversely affected Hawver's performance?*

As an alternative to his contingent fee arguments, Cheatham contends the fee agreement, if viewed as a flat fee, provided a financial disincentive for Hawver to fully investigate or prepare Cheatham's defense under the circumstances of the case. Two questions must be answered to resolve this claim: (1) Did this fee agreement create a conflict of interest? and (2) If so, did that conflict of interest adversely affect the adequacy of Cheatham's representation? *Mickens*, 535 U.S. at 168; *Gleason*, 277 Kan. at 650. The Seventh Circuit Court of Appeals has said:

"An actual conflict of interest exists if 'the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests.' *Stoia I*, 22 F.3d at 771 (quoting *United States v. Ziegenhagen*, 890 F.2d 937, 939 [7th Cir.1989]). Such a conflict has an adverse effect if 'but for the attorney's actual conflict of interest, there is "a [reasonable] likelihood that counsel's performance somehow would have been different." ' *Id.* (quoting *Frazer v. United States*, 18 F.3d 778, 787 [9th Cir.1994] [Beezer, J., concurring])." *Stoia v. United States*, 109 F.3d 392, 395 (7th Cir. 1997).

In *Winkler v. Keane*, 7 F.3d 304 (2d Cir. 1993), a case cited by Cheatham, the Second Circuit Court of Appeals considered a case in which trial counsel entered into a contingency fee agreement with his client. Winkler argued the fee agreement created an actual conflict of interest "because Winkler's interests in effective representation were pitted against trial counsel's monetary interest." 7 F.3d at 307. The Court of Appeals, agreeing with Winkler's ar-

gument, drew upon Justice Marshall's opinion concurring and dissenting in *Sullivan* for the proposition that

"[a]n attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.' [Citation omitted.]" *Winkler*, 7 F.3d at 307.

Cheatham also points to the ABA Guidelines in support of his argument that the fee agreement in this case was improper. These guidelines unequivocally disapprove of flat fees in death penalty cases, stating:

"The express disapproval of flat or fixed fee compensation provisions and statutory fee maximums is new to this edition. The provision is in keeping with Guideline 10.1(A) of the original edition, which mandates that counsel be fully compensated at a reasonable hourly rate of compensation, and follows the commentary to Standard 5-2.4 of the ABA Standards for Criminal Justice: Providing Defense Services, which observes that '[t]he possible effect of such rates is *to discourage lawyers from doing more than what is minimally necessary* to qualify for the flat payment.'" (Emphasis added.) ABA Guideline 9.1, History of the Guideline.

In other words, the Guidelines unequivocally disapprove of flat fees in death penalty cases precisely because such fee arrangements pit the client's interests against the lawyer's interest in doing no "more than what is minimally necessary to qualify for the flat payment." In this capital case, in which Cheatham faced the death penalty, the fee agreement entered between Hawver and Cheatham undoubtedly fostered a conflict of interest. And the circumstances in this case were even more pronounced when, as here, there was little likelihood of any payment because Cheatham was indigent, which Hawver knew.

As Cheatham argues, Hawver was no more likely to be paid if Cheatham were convicted than he would have been under a forbidden contingent fee agreement because Cheatham was indigent. On the other hand, the incentive to obtain a total acquittal was absent. And there can be little doubt that, under the fee agreement Hawver and Cheatham entered, Hawver's and Cheatham's interests diverged. Hawver, a solo practitioner with a "high volume" law practice requiring near daily court appearances, would have little financial incentive to invest the significant time commitment a cap-

ital case requires. On the contrary, his incentive would have been to pay attention to those cases whose billable hours were more likely to produce actual income. Hawver even concedes this point by testifying that he told Cheatham he was not going to be concentrating full-time on this case because "[he] had to earn a living."

Accordingly, we must determine whether this conflict adversely affected the adequacy of Hawver's performance. Cheatham maintains the financial disincentive under which Hawver labored was illustrated by his failure to adequately investigate and prepare the case and by his failure to withdraw and serve as an alibi witness for Cheatham. We agree.

Hawver estimated he spent around 200 hours in defense of Cheatham. This is appallingly low for a death penalty case defense and even more stunning when all but 60 of those hours, as Hawver testified, were spent in trial. In addition, Hawver failed to retain an investigator or to assemble a defense team to adequately present Cheatham's case due to an unwillingness to invest the resources this would take. As a result, potential defense witnesses were never interviewed and possible leads, such as an unexplained foot print at the crime scene, were never pursued. Hawver admitted openly that he had no intention of spending his own funds to prepare the case and no intention of taking time away from his other cases or his political activities. Hawver obviously realized the questionable nature of his inattention because he had Cheatham acknowledge it in writing. In sum, Hawver's representation bore a greater resemblance to a personal hobby engaged in for diversion rather than an occupation that carried with it a responsibility for zealous advocacy.

Hawver also failed to make himself available as an alibi witness for Cheatham by serving as his counsel. Cheatham notes that if called to testify, Hawver would have explained that on the day before the murders, Hawver had advised Cheatham to leave town because Hawver believed the police were looking for an excuse to arrest Cheatham. Similarly, Cheatham would have testified that he followed his counsel's advice and left for Chicago on the afternoon of December 13. And Hawver most certainly could have provided a measure of credibility to Cheatham's claim that he was in or on

his way to Chicago at the time of the murders by taking the stand and recounting to the jury how he had advised Cheatham to get out of town. But that line of testimony was foreclosed because Hawver was serving as trial counsel.

Even so, Hawver attempted during closing argument to present this evidence by stating, "Now when I first got this case, I got a call from Phillip Cheatham in Chicago—" but the State objected before he could finish because Hawver's argument was beyond the scope of admitted evidence. Clearly, Hawver recognized too late the contribution his testimony could have brought to the defense and attempted unsuccessfully to present it. But becoming an alibi witness would have required him to withdraw from the representation and forego any claim to a fee or the public attention garnered from serving as trial counsel in a double homicide trial.

We hold that under the circumstances presented the fee arrangement in this death penalty case created a conflict of interest for Hawver that adversely affected the representation of Cheatham in multiple respects. And we hold further that it is not necessary for Cheatham to show that he was actually prejudiced by Hawver's failure to adequately pursue his defense or withdraw and provide alibi support. Cheatham's convictions, therefore, must be reversed and the case remanded for a new trial.

Reversed and remanded.

ROBERT W. FAIRCHILD, District Judge, assigned.