NOT DESIGNATED FOR PUBLICATION

No. 112,370

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JORGE BEJARANO,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; R. WAYNE LAMPSON, judge. Opinion filed October 23, 2015. Affirmed.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Kansas City, for appellant.

*Sheryl L. Lidtke*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., ARNOLD-BURGER, J., and JOHNSON, S.J.

*Per Curiam*: Jorge Bejarano appeals from the district court's decision, after an evidentiary hearing, denying him relief under his K.S.A. 60-1507 motion. Bejarano contended that his trial counsel rendered him ineffective assistance by failing to (1) consult an expert in child interviewing techniques and (2) conduct an adequate investigation into whether others in the household could have exposed B.G., the child victim of Bejarano's sex crimes, to the herpes infection afflicting both B.G. and Bejarano. Bejarano raises those same claims on appeal, asserting the district court erred when it denied him relief. We reject those claims and affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

In November 2005, the State charged Bejarano with a count of rape and a count of aggravated indecent liberties with a child. B.G., his 9-year-old stepdaughter, was the alleged victim. The first trial resulted in a hung jury. James Spies represented Bejarano at that trial. Spies continued to represent Bejarano, and the case was retried in December 2006. That jury convicted Bejarano as charged. The district court sentenced Bejarano to a controlling prison term of 210 months. Bejarano appealed, asserting, first, that the trial court erred when it allowed B.G. to testify by closed-circuit television and, second, that the prosecutor engaged in misconduct during closing argument. This court affirmed Bejarano's convictions. See *State v. Bejarano*, 41 Kan. App. 2d 133, 202 P.3d 39, *rev. denied* 289 Kan. 1280 (2009). Because the issues in the direct appeal were narrow, our court did not summarize the trial evidence. Such a summary is necessary, though, to our analysis of the issues in this appeal, and follows.

*The jury trial*

Pamela Garcia testified that she made the initial report that B.G. was being abused by Bejarano. She was B.G.'s "aunt" in that B.G. was Garcia's husband's nephew's daughter. That nephew, Gustavo, his wife, Misti, and their child, B.G., had lived with Garcia in Kansas City for a time before Gustavo and Misti parted company. Gustavo returned to Mexico. Misti went to jail in Texas but eventually returned to Kansas. Misti and Bejarano became a couple in 1999 and had two children together. In early October 2005, Misti told Garcia that B.G. claimed Bejarano was sexually abusing her. Garcia did not then involve the authorities. Later that month, though, B.G. complained to Garcia that B.G.'s live-in babysitter, Jessie, had hit her. Garcia picked B.G. up and brought her to stay in Garcia's home. Shortly after Halloween B.G. disclosed to Garcia that Bejarano had been touching her private area. Garcia called the abuse hotline, which generated the investigation resulting in Bejarano's prosecution.

2

On cross-examination Spies obtained acknowledgments from Garcia that B.G. never said that Bejarano had raped her or licked her body. He raised questions about Garcia's credibility, pointing out that Garcia had failed to immediately report the abuse when Misti initially told her of it. He questioned why Garcia only acted to protect B.G. but not B.G.'s two younger half-sisters. Spies also challenged Garcia's motives for supporting B.G.'s disclosures, as Garcia acknowledged that Bejarano and Misti had greatly limited Garcia's involvement with B.G. for long periods of time. Finally, Spies questioned Garcia about whether men other than Bejarano frequented B.G.'s home while Bejarano was working.

Shortly after Garcia reported the abuse, B.G. was interviewed at Sunflower House, a child advocacy center. Sarah Byall, who conducted the interview, testified about the forensic interview process and her training to conduct such interviews. She stated that the goal of the process she employed was to obtain information from a child free from pressure or suggestion. Her recorded interview with B.G. was played for the jury at trial, although that recording is not included in the record on appeal. The prosecutor then examined Byall about several of her questions, her techniques, and B.G.'s responses. The trial transcript generally confirms that B.G. reported her rape and other improper touchings during the interview. Byall also interviewed B.G.'s 6-year-old half-sister, B.B. B.B. told Byall that she had seen her father and B.G. in bed under the covers. When B.B. raised the covers she saw her father licking B.G.'s stomach.

On cross-examination Spies challenged Byall on the interview process. Byall confirmed that Sunflower House only became involved in a case when it was brought to that agency by law enforcement or the Kansas Department of Social and Rehabilitation Services (S.R.S.). He then questioned Byall about whether the agency was truly independent and impartial given its role in the investigatory process. Byall admitted that she does not ask the child if the child wants to participate in the interview. Spies also pointed out that at times during the interview Byall sat very close to B.G. He asked if her

3

proximity to the child could be intimidating, but Byall responded that she could not speak for the child. Spies suggested that Byall's frequent repetition back to B.G. of statements B.G. made was done in a tone that reinforced those statements, which Byall denied.

Annette Rasmussen, a licensed clinical psychotherapist, testified that she treated B.G.'s reported symptoms of nightmares, anger, and hurting and cutting herself. Rasmussen found the symptoms to be consistent with posttraumatic stress disorder. Rasmussen assumed the trauma was the sexual abuse Garcia had reported to her. However, over the 21 sessions Rasmussen conducted with B.G., B.G. made no verbal disclosures about sexual contact. B.G. would only say that she was told to keep it a secret but would not say who gave her those directions. On cross-examination, Rasmussen agreed with Spies that PTSD could result from an unstable home life like that of B.G. Rasmussen acknowledged that B.G. herself never confirmed the intake information given by Garcia that B.G. was even having nightmares or cutting herself. B.G. also told Rasmussen, at least on one occasion, that she was not happy living with Garcia.

Stephen Schaum, M.D., testified that he saw B.G. on December 10, 2004, in his capacity as a pediatrician associated with Children's Mercy Hospital. B.G.'s mother, Misti, brought her to him. B.G.'s genitals were significantly inflamed, red and puffy, and the child was having pain and difficulty urinating. After testing, the doctor determined that B.G. was suffering an outbreak from the presence of the herpes simplex virus (HSV) combined with a staph infection. Dr. Schaum treated the symptoms with antibiotics. He did not, and said he could not, inquire as to who might have exposed B.G. to the herpes virus. Being a mandated reporter, he contacted S.R.S. On cross-examination, Dr. Schaum acknowledged that the herpes symptoms he treated might not have been B.G.'s first such outbreak.

Janet Joest, who became B.B.'s foster parent, testified that in July 2006 B.B. told her that her father was a "licking machine." B.B. explained that she had seen Bejarano

4

licking B.G.'s abdomen. Joest informed B.B.'s S.R.S. caseworker. On cross-examination Joest confirmed that B.B. described no other questionable touchings of B.G., or of B.B. herself, by Bejarano. B.B. had told Joest that both Misti and Jessie had men in and out of the house while Bejarano was at work. They would go into the bedroom and close the door. However, B.B. did not say she knew what was going on then, just that she was scared and angry for being left alone.

B.B. then testified. She said that, about a year before trial, she stopped living with her parents because they were doing bad things. She said she had seen Bejarano licking B.G.'s stomach, although her description of how she saw that was contradictory. On cross-examination she admitted to Spies that she could not actually see the licking because Bejarano and B.G. were under the blanket. She said, "But I just knew it was happening," even though she could not see it.

Dr. Dugald Taylor, a pathologist, testified that in June 2006 he analyzed a blood sample from Bejarano. The sample showed the presence of the antibody for HSV type 1, indicating that Bejarano had a prior exposure to that virus. On cross-examination the doctor said that virus is very common, being present in from two-thirds to 90% of the adult population. An exposed person can have a latent infection that never exhibits any outward signs or symptoms. No testing can reveal when or how the virus exposure occurred. The doctor said that generally available testing could not determine whether, *e.g.*, Bejarano infected another person who had the same type of virus. Such testing could only be done at a lab, like that at the Center for Disease Control, which could conduct molecular biogenetic sequencing of each of the viral DNAs for comparison.

Marita Pipes, an investigative social worker with S.R.S., testified that on December 15, 2004, S.R.S. received a Children's Mercy Hospital report that B.G. was afflicted with genital herpes. Unfortunately, Pipes did not actually investigate that red flag regarding possible abuse. She merely tried to contact the family but, after 3 weeks

5

without a response, she gave up and closed the case. Then on June 30, 2005, Pipes investigated a report that B.G.'s insulin for her diabetes had been withheld. She interviewed the family and determined that B.G. had only missed one dose. Oddly, Pipes did not ask B.G. or the family about the December 2004 genital herpes report. On November 22, 2005, Pipes began to investigate Garcia's report that B.G. had been sexually abused by Bejarano. She conducted a limited interview of B.G. who confirmed at least some of the abuse claims. S.R.S. initiated an investigation and referred B.G. to Sunflower House for the forensic interview Byall conducted.

Stephanie Strout, a master's level physician's assistant at Sunflower House, testified that she had examined B.G. for signs of sexual abuse. The examination showed no abnormalities. B.G. was tested for several sexually transmitted diseases including, eventually, herpes. B.G. had no other STDs, but she did test positive for HSV type 1. Strout indicated that the first outbreak of this virus in the female genitals would be bilateral and painful with blisters and sores, like the conditions Dr. Schaum found in B.G. back in December 2004. Strout said there is a very low recurrence of such severe symptoms after that first outbreak. Generally, to contract genital herpes, the source of the virus must actually touch the genitals. Males with this virus often do not develop penile ulcers. Nevertheless, they are subject to asymptomatic shedding and can transmit the virus through their body fluids, like semen or saliva. The first outbreak occurs from 2 to 14 days after contact with the virus source. B.G. and Bejarano each had the same virus, HSV type 1. Once one is infected, the virus lives on in the body's nerves for life.

On cross-examination, Strout acknowledged that it was possible to transfer the virus by means other than intercourse so long as the source touched the genitals. She confirmed that lab testing could not reveal whether Bejarano even had the virus in December 2004 when B.G. had her outbreak.

6

B.G. testified via closed-circuit television. She said that, beginning when she was 7, Bejarano did bad things to her. The first incident occurred while her mother was gone. B.G. was lying down on her bed and Bejarano was on top of her. Bejarano touched her "front private part" on the inside of her clothes with his hands. He stopped touching her when he heard her mother's car pull into the driveway. Bejarano told B.G. not to tell anybody about the touchings. B.G. described a similar incident occurring a few days later. She said the bad touches continued over the next 2 years, several times a week. B.G. said there were a couple of times, about a year after the touches began, when "he touched my front private part with his front private part." It would "hurt more" when he touched her private with his private than it did when he touched her private with his hands. On one occasion Bejarano's private part "went inside" her front private part. B.G. told him "it hurt." That incident occurred when she was closer to 9 years old. Shortly thereafter, "I think the next day," her private part began to sting when she went to the bathroom. Her mother took her to Dr. Schaum. The doctor gave her some pills and the pain went away in a couple of days. B.G. testified that she had never had problems like that before.

On cross-examination B.G. denied that B.B. had ever seen anything happen between Bejarano and B.G. B.G. also denied that Bejarano had ever licked her private part. Spies raised the possibility that B.G. might feel pressured to testify, but B.G. denied that. Spies asked if she was testifying to make anyone happy. B.G. denied that as well. Finally, B.G. denied that she had been promised anything or offered a present for testifying.

Bejarano testified in his own defense. He denied that he had ever done any of the sexual things B.G. attributed to him. He loved B.G. as a daughter. B.G. always called him Dad. On cross-examination, Bejarano explained that sometime in late 2005 Misti was arrested on an old Texas drug warrant and went to prison there, where she was still serving her time. Bejarano denied that he was alone with the girls very often because, if

7

the girls were not away with Misti, Jessie or another sitter was always present with them at home. He denied that he had ever had a genital herpes outbreak, and had not known he had the virus until he was tested.

During the State's closing argument, the prosecutor acknowledged that the case boiled down to B.G.'s word against Bejarano's. The prosecutor also acknowledged that various witnesses gave differing testimony on just what acts B.G. had described to them. However, the prosecutor argued that B.G. had been reasonably consistent, especially regarding the charged rape and the touching of B.G.'s front private part. Recognizing that the HSV evidence was not conclusive, the prosecutor argued that it was consistent with the rape B.G. eventually reported: within a day or so of that sex act B.G. developed pain on urination which Dr. Schaum attributed to HSV type 1, the same virus present in Bejarano.

Spies on closing exploited the inconsistencies in B.G.'s varying descriptions given to different witnesses of the acts Bejarano had committed. Spies blamed Misti for ignoring S.R.S.'s attempts to contact the family after the late-2004 herpes report: she was the one at home, and she, not Bejarano, could answer phone calls or read notices and letters written in English. He pointed out that there were other sources for B.G.'s virus exposure, as both Jessie and Misti were having strange men in the home, doing drugs, while Bejarano was working. He argued that the HSV testing evidence was not conclusive and pointed out that B.G. may have had an earlier outbreak known only to Misti. He faulted the police for not investigating other potential sources for the exposure. He challenged Garcia's benevolence, noting that she had reasons to begrudge Bejarano for excluding her at times from B.G.'s life. He questioned the neutrality of Sunflower House and pointed out that Byall did not give B.G. the option to decline the interview. Rather, Byall pressured B.G. with intimidating body language. He argued that B.G.'s inconsistent statements were not credible and, if she was molested, it was by the men

visiting Misti and Jessie. Finally, he asked the jurors to recall Bejarano's testimony and consider whether they could believe B.G.'s testimony beyond a reasonable doubt.

As noted above, the jury found Bejarano guilty and he was unsuccessful in his direct appeal.

*The K.S.A. 60-1507 motion hearing*

In October 2010, Bejarano filed a pro se K.S.A. 60-1507 motion. For reasons not well explained in the record, the district court finally conducted an evidentiary hearing on the motion November 13, 2013. In relevant part, Bejarano claimed that his trial counsel had been ineffective for failing to (1) consult with and call an expert witness to testify regarding child interviewing techniques and (2) adequately investigate critical evidence concerning the source of B.G.'s herpes virus exposure.

The district court held an evidentiary hearing. Bejarano called only one witness, his trial counsel, Spies. Spies testified that he had been practicing criminal law since 1995 as either prosecutor or defense counsel. He had tried approximately 75 jury trials. He had handled hundreds of sex crime cases, with over a hundred involving a child victim. He had tried about 20 sex crime cases to a jury, 10 to 15 of which involved child victims, and 7 of which were as defense counsel. He served over 4 years as a prosecutor, during which time he received specialized training in the area of sex crimes against children and child interviewing techniques. Spies left the district attorney's office in 2003 and began his practice of criminal defense. Spies had given presentations on cases involving child victims, defending child sex abuse cases, and preparing children to testify in court.

Spies recounted the basic evidence in the case. He described the HSV medical evidence involved, and, having consulted with a medical doctor who had a great deal of experience treating sexually transmitted diseases, said he knew what he needed in order

9

to cross-examine the State's experts. He described the timeline of the relevant events in the case. Spies acknowledged that cases involving young child victims were always challenging. Bejarano's case was particularly so because B.G. had tested positive for herpes and could have been molested. However, Bejarano told Spies he had only been with one woman in his life, Misti, and he had never seen anything that would lead him to believe she had exposed him to the virus. Spies and Bejarano agreed Bejarano should be tested, as the absence of the virus in him would support his denial that he had ever had sex with B.G. Unfortunately for the defense, the tests came back positive for an exposure to the same type of HSV found in B.G. The trial strategy, then, became one of general denial, *i.e.*, to challenge B.G.'s credibility and attack the investigation of her claims.

Spies testified that he was familiar with Sunflower House. He described its services and methods in great detail. He was also aware of the process for hiring experts in the area of child interviews, having hired such experts on prior occasions. From that and his other experience, Spies was acquainted with the potential criticisms of certain techniques and protocols often used during these interviews. He said he made the decision whether to hire an expert on a case-by-case basis by considering a number of factors he then listed. He considered hiring an expert witness in Bejarano's case but did not do so after reviewing the video of B.G.'s forensic interview. When Bejarano's motion counsel asked why he chose not to hire an expert, Spies said he was confident that he did not need to consult with one to prepare himself to cross-examine the child witnesses or the forensic interviewer. Spies stated:

> "Well, an expert can testify to any number of things, obviously. And there's a lot of things an expert cannot testify to. For example, an expert could never come in and say, 'Oh, I think these kids are lying.'
>
> . . . .

"An expert can certainly testify to interview techniques. They can testify as to suggestibility of children. I believe that in my experience and in my experience in prosecuting cases like this, interviewing children, preparing them to testify in court, that I could sufficiently cross-examine the kids in court and sufficiently cross-examine the Sunflower House interviewer effectively without calling an expert witness."

Bejarano's motion counsel asked Spies why he did not obtain testimony from B.G.'s mother, Misti. Spies said he had discussed with Bejarano the possibility of having Misti testify and whether that would actually be in his best interest. According to Spies, Bejarano wanted Misti to testify that she did not believe B.G.'s claims of abuse. Knowing that such testimony would be inadmissible and expecting the jury would get the same information from another source (in fact, the jury did:  Pipes testified on direct examination that Misti did not believe B.G.), Spies chose not to attempt to have her returned from Texas. Motion counsel asked whether Spies investigated whether Misti could have exposed B.G. to the virus. Spies did not know whether Misti had herpes because he did not talk to her or have her tested. But Spies stated that he had no reason to suspect that B.G. may have contracted the herpes virus from Misti because Bejarano maintained that Misti did not have herpes and he had never seen any symptoms in Misti. Bejarano never requested that Misti be tested.

Motion counsel did not ask Spies any questions about Jessie, the live-in babysitter. When the prosecutor asked Spies if he had tried to contact her, Spies said Bejarano had given him a phone number but his attempts to reach her were unsuccessful.

Bejarano declined to testify at the hearing. Speaking through his attorney, and aided by a Spanish interpreter, Bejarano informed the court that he felt Spies "testified truthfully about their interactions, and so he doesn't feel like there's anything else to add to assist this Court in determining whether or not representation was sufficient." Thereafter, Bejarano's attorney argued that Spies' representation was ineffective because he should have (1) consulted with and presented expert witness testimony relating to

11

child interviewing techniques and (2) called Misti to testify and consulted with a medical expert regarding the possibility that B.G. could have contracted the herpes virus in another way. The State responded that there was no evidence other than Spies' testimony before the court that could prove Bejarano's allegations of ineffective assistance of counsel, and Spies' testimony proved he was not ineffective. Otherwise, Bejarano merely suggested without proof what might have happened had Spies made different strategic decisions.

The district court subsequently denied Bejarano's 60-1507 motion, holding there was no evidence to support a finding that he had received ineffective assistance of counsel. Specifically, the court held:  "While the facts as noted did indicate that Mr. Spies may have not argued all matters as preferred by the plaintiff, no evidence was introduced that caused the Court to find that Mr. Spies in his representation was ineffective." Bejarano timely appeals.

ANALYSIS

Bejarano argues on appeal the district court erred in denying his K.S.A. 60-1507 motion. He advances the same arguments he raised in the district court. Any other issues raised below in Bejarano's K.S.A. 60-1507 motion or presented at the evidentiary hearing are deemed abandoned. See *State v. Holman*, 295 Kan. 116, 125, 284 P.3d 251 (2012) (issues not briefed by the appellant are deemed waived and abandoned).

When the district court denies a K.S.A. 60-1507 motion after conducting an evidentiary hearing, we review whether the district court's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the court's conclusions of law. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007). In doing so, we give deference to the district court's findings of fact, accepting as true the evidence and any inferences that support or tend to support the court's findings.

12

Ultimately, we conduct an unlimited review of the district court's conclusions of law and its decision to grant or deny a K.S.A. 60-1507 motion. 285 Kan. at 355.

To establish ineffective assistance of counsel, Bejarano must demonstrate (1) that Spies' performance was constitutionally deficient, which requires a showing that he made errors so serious that his performance was less than that guaranteed by the Sixth Amendment to the United States Constitution, and (2) that Spies' deficient performance prejudiced the defense, which requires a showing that his errors were so severe as to deprive Bejarano of a fair trial. See *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014).

Thus, defense counsel is only ineffective when his or her efforts are objectively unreasonable when measured against prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). Judicial scrutiny of counsel's performance is highly deferential, and this court must eliminate the distorting effects of hindsight, reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time. *State v. Cheatham*, 296 Kan. 417, 431-32, 292 P.3d 318 (2013). To show prejudice, a defendant must submit evidence that, but for counsel's deficient performance, there was a reasonable probability that the outcome of his or her trial would have been different. 296 Kan. at 432. Moreover, strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. 296 Kan. at 432.

Generally, it is "'within the province of a lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions.'" *Sola-Morales v. State*, 300 Kan. 875, 887, 335 P.3d 1162 (2014) (quoting

13

*Thompson v. State*, 293 Kan. 704, 716, 270 P.3d 1089 [2011]). Hence, a defendant bears the burden of showing that trial counsel's actions were not the product of trial counsel's strategy. 300 Kan. at 888. In light of these standards, we review Bejarano's claims of error.

*Failure to consult an expert in child interviewing techniques*

Bejarano cites to us several cases which have recognized the potential efficacy of expert testimony on child interviewing techniques in cases alleging sexual abuse. In particular, he relies on *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), to support his claim that Spies was ineffective for failing to hire such an expert.

In *Mullins*, Mullins had been convicted of committing sex offenses against a child. He filed a K.S.A. 60-1507 motion alleging ineffective assistance of trial counsel based on counsel's failure to hire an expert in child interviewing techniques. At the evidentiary hearing, Mullins called three witnesses: an experienced trial attorney, a psychologist with expertise in the area of interviewing children alleging sexual abuse, and Mullins' relatively inexperienced trial counsel. Mullins' witnesses testified that: (1) the need to hire an expert in child interviewing was common knowledge among criminal defense attorneys at the time of Mullins' trial, (2) there were serious deficiencies in the conduct of the various interviews of the child which cast doubt on the reliability of the results of the interviews and on the child's credibility, and (3) trial counsel had not looked into the issue of child interview techniques or the possibility of consulting with an expert. 30 Kan. App. 2d at 712-15. The State called no witnesses and subjected Mullins' witnesses to only minimal cross-examination. The trial court denied relief finding, in spite of the contrary uncontroverted testimony, that few attorneys would have consulted an expert.

14

On appeal, the *Mullins* court held that it was "compelled" to reverse the district court because of the "essentially uncontroverted record at the 1507 hearing." 30 Kan. App. 2d at 718. The only evidence adduced at the motion hearing supported a finding of ineffective assistance of counsel. Further, Mullins demonstrated prejudice by showing that, had an expert such as the psychologist who testified at the motion hearing been called as a witness at trial, "the jury would have been presented with relatively strong evidence to potentially undermine the allegations of abuse." 30 Kan. App. 2d at 717. Thus, the *Mullins* court was required by Mullins' uncontroverted evidence to grant him a new trial. 30 Kan. App. 2d at 718.

*Mullins* clearly does not establish a bright-line rule that a defense attorney must always consult an expert on child interviewing techniques in child sexual abuse cases. Rather, *Mullins* confirms that when a K.S.A. 60-1507 movant proves that counsel's failure to obtain an expert is both objectively unreasonable and prejudicial, the movant is entitled to relief.

Following the analytical approach in *Mullins*, we must first ask: Was Spies' decision not to hire an expert objectively unreasonable? The evidence at the motion hearing was the polar opposite of that in *Mullins*. There, the only evidence before the court supported a finding of ineffective assistance. Here, the only actual evidence was Spies' testimony. That testimony, as recounted in part above, demonstrates that Spies' decision to forego the hiring of an expert was objectively reasonable. Spies testified that he had extensive training and expertise in child interviewing techniques, had prior experience with experts in that field, and duly considered whether to consult such an expert. After a thorough review of B.G.'s interview, however, Spies determined there was no suggestibility issue or any reason to have an expert separately critique the interviewer's approach to the interview. As Spies indicated at the hearing, and as the trial record confirms, Spies did have the expertise to cross-examine Byall in an effort to challenge her technique. Moreover, Bejarano did not present any evidence to show that

15

there were any deficiencies in B.G.'s forensic interview not exposed by Spies at the trial that required the retention of an expert.

Clearly, Spies' decision not to hire an expert on child interviewing techniques was a decision based on trial strategy made after an adequate investigation. On issues of trial strategy, *e.g.*, whether to call a particular witness, we must give great deference to the informed decisions of the attorney who actually tried the case. See *State v. Ward*, 227 Kan. 663, Syl. ¶ 1, 608 P.2d 1351 (1980); *State v. Lewis*, 33 Kan. App. 2d 634, 645, 111 P.3d 636, *rev. denied* 277 Kan. 924 (2003). If any deficiencies existed in Spies' performance, it was Bejarano's burden to demonstrate they were not the result of trial strategy. See *Ferguson v. State*, 276 Kan. 428, 445-46, 78 P.3d 40 (2003). Bejarano offered no evidence to challenge the effectiveness of Spies' decision on foregoing the hiring of an expert. He has failed in his burden of proof on this claim.

*Failure to investigate witnesses*

Bejarano also argues that Spies was ineffective in failing to contact certain witnesses to testify in order to present the jury with other options as to how B.G. could have contracted the herpes virus. First, he alleges that Spies made no effort to contact Misti, despite the fact there was a "high probability" that she also carried the same herpes virus. Second, Bejarano claims Spies made too little effort to contact Jessie, B.G.'s babysitter.

Contrary to Bejarano's argument, Spies testified that Bejarano only wanted Misti to testify that she did not believe B.G.'s accusations. Spies stated that he expected that this point would be sufficiently established through other witnesses, and it was. And Spies had no reason to suspect that B.G. may have contracted the herpes virus from Misti because Bejarano indicated that Misti did not have herpes. Thus, it does not appear that Spies' decision not to contact Misti was objectively unreasonable. Moreover, without

16

Misti, Spies was able to argue that one of Misti's male visitors was the likely perpetrator. Finally, Bejarano did not call Misti to testify at the evidentiary hearing. He thus did not present any evidence to show that Misti had the HSV type 1 virus found in B.G., nor did he demonstrate how having Misti's testimony would have helped at his trial. Bejarano has failed in his burden to demonstrate that Spies was ineffective in not obtaining Misti as a witness.

On appeal Bejarano faults Spies' failure to call Jessie as a trial witness. We note that Bejarano did not ask Spies a single question about Jessie at the motion hearing, nor did he argue to the district court that Spies was ineffective for not calling her as a witness. The State asked Spies about Jessie, and Spies simply responded that Bejarano gave him Jessie's name and phone number but he was unable to reach her. Bejarano has failed in his burden to demonstrate that Spies was ineffective in not obtaining Jessie as a witness.

Bejarano's evidence fails to establish on appeal that the district court erred in denying his claims for relief under K.S.A. 60-1507.

Affirmed.