NOT DESIGNATED FOR PUBLICATION

No. 112,012

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ARNULFO QUEZEDA-DURAN,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed November 13, 2015. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., STANDRIDGE, J., and BURGESS, S.J.

*Per Curiam*:  Arnulfo Quezeda-Duran appeals from the district court's denial of his K.S.A. 60-1507 motion after an evidentiary hearing. In 2006, Quezeda-Duran was convicted of intentional second-degree murder as well as possession of cocaine and possession of methamphetamine. His convictions were subsequently affirmed by a panel of this court, and the Kansas Supreme Court denied review. In this appeal, Quezeda-Duran contends that this court should reverse the district court's denial of his K.S.A. 60-1507 motion because his trial and appellate counsel were ineffective. But Quezeda-Duran has failed to establish that either his trial counsel or his appellate counsel were ineffective. Thus, we affirm.

1

In January 2006, Quezeda-Duran was charged in Saline County with one count of first-degree murder, which the State eventually amended to also include one count each of possession of cocaine and possession of methamphetamine. He retained D. Lee McMaster of Wichita as his defense counsel. After the district court bound Quezeda-Duran over for trial at the preliminary hearing, it suggested a trial date of May 9, 2006. Evidently, that date did not work for McMaster, and he stated that he would waive the 90-day speedy trial requirement and agree to a later trial date. The trial was then set for June 20, 2006. Although it appears from the record that Quezeda-Duran has some understanding of the English language, an interpreter was present at the hearing. Nevertheless, Quezeda-Duran did not object or say anything when McMaster agreed to the continuance.

On June 6, 2006, the parties appeared before the district court on the State's request for a continuance to await KBI lab testing results. McMaster stated that the defense had no objection to the continuance and that his client would again waive his right to a speedy trial. McMaster noted, however, that Quezeda-Duran did not have an interpreter present for the hearing. As a result, the district court then gave McMaster time to confer with Quezeda-Duran. After conferring with his client, McMaster stated on the record that Quezeda-Duran understood the continuance and the waiver of his right to a speedy trial. In addition, McMaster stated that he also wanted to receive the forensic testing results. The district court then asked Quezeda-Duran if he was willing to join in the motion to continue and he answered, "Right." The district court then set trial for October 10, 2006.

A 7-day jury trial began on October 10, 2006. The facts were summarized in Quezeda-Duran's direct appeal as follows:

"The overriding testimony in Duran's jury trial came from two eyewitnesses who stated that they saw Duran shoot and kill Angel Lerma in the men's bathroom of the 4-H building in Salina during a New Year's Eve dance on December 31, 2005.

"There was a history to the relationship between Duran and Lerma. Duran and his ex-wife, Irma Lopez, had divorced in March 2001. After the divorce, Lopez dated Lerma several times in December 2001 which caused Lerma's wife, Berta, to become suspicious that a sexual relationship existed which Lerma later confirmed. This resulted in Berta divorcing Lerma in March 2002. Several years later, Duran and Berta began to see each other in an on-again, off-again sexual relationship from September to December 2005.

"Although Lopez testified Duran did not have a problem with her relationship with Lerma, Berta testified that when she and Duran were dating in the fall of 2005, Duran would make comments like it was their turn to get back at Lerma and Lopez, and Duran had not gotten over the other relationship. Berta also testified that while they were at a rodeo, when Duran saw Lerma and a new girlfriend, Duran reached into his glove compartment and pulled out a gun to show Lerma. Lerma quickly left.

"The testimony concerning events at the dance showed that Lerma, his brother, Octavio, Lerma, and Octavio's girlfriend, attended the dance together. Around midnight, Octavio and Lerma went to the men's restroom along with two of Lerma's work friends. Duran and a man named Edgar Flores were already in the restroom. Octavio testified Duran was along the wall with several guys around him. Octavio and Lerma used the urinals while the two friends stayed at the sinks. Octavio testified that he finished using the urinal and then started to exit the restroom. He turned back to witness Lerma turn around from the urinal and then Duran shot Lerma in the head. As Duran ran from the restroom, Octavio yelled at the security guards to stop Duran because he had just shot Lerma.

"Flores testified that when he entered the restroom earlier, Duran was inside. As Flores used the urinal, he heard the voices of other people come into the restroom. Flores turned and then stopped to talk with Duran who was standing along the wall. Flores testified that Lerma was using one of the urinals at the time. Flores testified that Duran

3

pulled a pistol out of his waistband, stepped in front of him, and approached Lerma at the urinal. Flores said that when Lerma turned around, Duran immediately shot him in the head.

"Before Duran could be apprehended, one of the security guards saw Duran throw a gun to the ground as he tried to elude the guards. After Duran was caught, security guards discovered several 9mm bullets in his pants pocket and a couple of bags of drugs in his jacket which tested positive for cocaine and methamphetamine.

"After Duran was taken into custody, he told the police he was fighting with someone bigger than himself at the dance and he was trying to separate fighting people. Duran said he pulled his gun out because someone had hit him. After Duran sobered up the next afternoon, he spoke with officers. Officer Steve Henry testified Duran could remember who he went to the dance with, how much he drank, what he was wearing, and many other things, but could not remember walking into the restroom at midnight, seeing Lerma, or anything that happened during the shooting in the restroom.

"Duran testified at trial that on December 31, 2005, he had consumed approximately 30 beers during the day and then drank 5 glasses of tequila at the New Year's Eve dance. He also admitted to snorting cocaine several times during that day. It was also undisputed that Duran carried a fully-loaded 9mm semi-automatic handgun in his back waistband." *State v. Quezeda-Duran*, No. 98,295, 2009 WL 596517, at *1-2 (Kan. App.) (unpublished opinion), *rev. denied* 289 Kan. 1284 (2009).

Regarding the first-degree murder charge, McMaster requested that the district court instruct on the lesser included offenses of second-degree murder, unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter. He also requested a jury instruction on self-defense and voluntary intoxication. The district court denied all of these requests except for instructing the jury on the lesser included offense of second-degree murder and on voluntary intoxication. After deliberation, the jury found Quezeda-Duran guilty of the lesser included offense of intentional second-degree murder

4

as well as possession of cocaine and possession of methamphetamine. The district court subsequently sentenced him to serve a total of 225 months of imprisonment.

A panel of this court affirmed Quezeda's convictions, and the Kansas Supreme Court denied review on November 5, 2009. *Quezeda-Duran*, 2009 WL 596517. Less than a year later, on November 3, 2010, Quezeda-Duran filed a timely K.S.A. 60-1507 motion. In the accompanying memorandum in support, Quezeda-Duran argued that there were several trial errors in his case and that both trial and appellate counsel were ineffective for failing to challenge these alleged errors. Among other things, he alleged that McMaster was ineffective for failing to protect his right to a speedy trial, failing to obtain an expert witness, and failing to file a motion to suppress. In addition, Quezeda-Duran alleged that his appellate counsel was ineffective for failing to raise any of these alleged errors on appeal.

The district court appointed counsel to represent Quezeda-Duran on his K.S.A. 60-1507 motion, and a preliminary hearing was held on April 26, 2011. The district court held another preliminary hearing on September 9, 2011, to consider the State's arguments in opposition to Quezeda-Duran's motion. Following the second hearing, the district court took the matter under advisement and granted the parties "leave to file any additional authorities for the Court's consideration by September 16, 2011." Thereafter, the district court determined that there were issues of fact that needed to be resolved in an evidentiary hearing.

On March 8, 2013, the district court held an evidentiary hearing on Quezeda-Duran's K.S.A. 60-1507 motion. The parties stipulated that McMaster was unable to testify because he had passed away. In support of his motion, Quezeda-Duran testified that other than when appearing at hearings, he only met with McMaster three times before trial. He testified that although McMaster discussed a couple of plea offers with him and talked about possible defenses, he did not discuss trial strategy. He further

testified that McMaster did not discuss hiring an expert witnesses with him nor did he discuss filing a motion to suppress statements given to police. Quezeda-Duran testified that he did not recall the June 6, 2008, hearing where his speedy trial rights were discussed. Likewise, he did not remember any discussions about his right to be brought to trial within 90 days. Quezeda-Duran testified that he wanted the results of any tests that were being conducted on the gun, DNA, or fingerprints before trial. In addition, Quezeda-Duran testified that he never met with or spoke to his appellate attorney, Matthew Edge.

Also, Quezeda-Duran called Jillian Thorn Waesche Seaton, a criminal defense attorney, as an expert witness. She testified that she had not been involved in either the trial or the appeal. Rather, she rendered her opinion based on a review of the transcripts in Quezeda-Duran's case. In her opinion, Quezeda-Duran did not voluntarily and knowingly waive his right to a speedy trial. Specifically, she testified "that it was Mr. McMaster who not only agreed to the continuance by the State, but also waived Mr. Quezeda-Duran's right to a speedy trial on the record without consultation with him."

Seaton also testified that filing a motion to suppress the statements Quezeda-Duran made initially to the police shortly after the incident would have benefitted the defense. She opined that there was no showing that Quezeda-Duran understood his *Miranda* rights. Although Seaton admitted that she had never handled an appeal, she rendered the opinion that this would have been yet another issue to be raised on appeal. She testified that it would have been helpful if McMaster had spoken to an expert on the effects of alcohol and drug use on Quezeda-Duran's mental abilities. In her opinion, most people are not familiar with the effects of alcohol and cocaine on someone's mental ability. As such, she believed that expert testimony could have affected the outcome of the trial.

Testifying first for the State was Amy Hanley, the lead prosecutor in Quezeda-Duran's case. In her opinion, jurors can understand intoxication and its effect on people without the assistance of an expert witness. Moreover, she testified that if McMaster had presented an expert witness on intoxication, she would have challenged the witness on cross-examination, and she would have designated an expert to testify on behalf of the State. She testified that McMaster raised the defense of voluntary intoxication and self-defense throughout the trial.

Matthew Edge—who wrote the appellate brief on behalf of Quezeda-Duran in his direct appeal—also testified for the State. Edge testified that he had worked for the Kansas Appellate Defenders office since 2002 and wrote approximately two to five appellate briefs each month. Moreover, he testified that the chief attorney in his office edited his appellate briefs prior to filing. He also testified that he does not always raise every potential issue on appeal because there are page limits on the briefs and because he wants to focus on stronger issues. According to Edge, he and the chief attorney use their best judgment to decide which issues to raise in a given appeal. Although he did not recall specifically what issues he raised in Quezeda-Duran's brief, he thought he raised the strongest issues. Edge further testified that he thought that the brief he wrote was his best strategy at the time.

At the conclusion of the evidentiary hearing, the district court took the matter under advisement. It also asked the parties to submit proposed findings of fact and conclusions of law. On May 10, 2013, the district court entered its order denying Quezeda-Duran's K.S.A. 60-1507 motion. Thereafter, Quezeda-Duran timely filed a notice of appeal.

ANALYSIS

*Standard of Review*

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2014 Kan. Ct. R. Annot. 285). We then review the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support its conclusions of law. Moreover, our review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). Substantial competent evidence is that evidence possessing both relevance and substance. It furnishes a substantial basis of fact from which the issues presented can be reasonably resolved. *State v. Brown*, 300 Kan. 542, 546, 331 P.3d 781 (2014).

*Issues Presented*

On appeal, Quezeda-Duran raises three issues (1) whether appellate counsel was ineffective for failing to argue on direct appeal that his speedy trial rights were violated; (2) whether trial counsel was ineffective for failing to file a motion to suppress statements made to police; and (3) whether trial counsel was ineffective for failing to call an expert at trial on the issue of intoxication.

*Speedy Trial*

Quezeda-Duran first contends that the district court erred in finding that his appellate counsel was not ineffective for failing to raise the speedy trial issue on appeal. Like the standard of review for a K.S.A. 60-1507 motion, a claim alleging ineffective assistance of counsel presents mixed questions of fact and law. We review the district court's factual findings for support by substantial competent evidence and review its legal

conclusions based on those facts de novo. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

To establish ineffective assistance of counsel on appeal, a defendant must show (1) that counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness and (2) that the defendant was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful. *Miller v. State*, 298 Kan. 921, 930-31, 934, 318 P.3d 155 (2014).

For the first prong, to determine whether appellate counsel's performance was objectively reasonable, the reviewing court employs a strong presumption that counsel's conduct was reasonable and "'must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" [Citation omitted.]" 298 Kan. at 931. Failure to raise an issue on direct appeal is not automatically ineffective assistance. See *Laymon v. State*, 280 Kan. 430, 439, 122 P.3d 326 (2005). "Conscientious counsel should only raise issues on appeal which, in the exercise of reasonable professional judgment, have merit." *Baker v. State*, 243 Kan. 1, 10, 755 P.2d 493 (1988).

The district court noted that Edge testified that he made a list of possible issues for appeal but included only the strongest issues in his brief. He also testified that in his opinion the brief presented the best strategy for the appeal. As such, the district court found that Edge's conduct did not fall below an objective standard of reasonableness. The district court also determined that Edge's conduct did not prejudice Quezeda-Duran. Furthermore, the district court did not believe that Quezeda-Duran would have been successful on appeal if he had raised the speedy trial issue.

9

Quezeda-Duran argues that the district court should have found appellate counsel's performance to be deficient because the district court even stated in its opinion that the speedy trial issue should have been raised on direct appeal. But Quezeda-Duran takes the district court's statement out of context. In saying that the speedy-trial issue should have been raised below, the district court was analyzing why it could not consider whether Quezeda-Duran's speedy trial rights were violated for the first time in a K.S.A. 60-1507 motion—that is because it would have constituted a trial error. See Supreme Court Rule 183(c)(3) (2014 Kan. Ct. R. Annot. 286) ("A proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Mere trial errors must be corrected by direct appeal, but trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal, provided exceptional circumstances excuse the failure to appeal."). Nevertheless, the district court found that it could consider whether trial counsel was ineffective for waiving his speedy trial rights—an issue not raised by Quezeda-Duran in this appeal—and whether appellate counsel was ineffective for failing to raise the issue on direct appeal.

Quezeda-Duran argues that Edge's statement that not including the speedy trial issue on direct appeal "'was the best strategy,'" was conclusory and unsupported by a factual or legal basis. Nevertheless, the district court found that Edge's testimony was credible and that it supported a finding that Edge's conduct did not fall below an objective standard of reasonableness. Just as trial strategies cannot be challenged if there is evidence that counsel made a strategic decision after a thorough investigation of the law and the facts relevant to the plausible options, strategic appellate decisions also should not be challenged if appellate counsel has made a sufficient investigation. See *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (stating that if trial counsel makes a strategic decision after a thorough investigation of the law and the facts relevant to the plausible options, then the decision is virtually unchallengeable).

10

A defendant bears the burden of showing that trial counsel's actions were not the product of strategy. *Sola-Morales v. State*, 300 Kan. 875, 887-88, 335 P.3d 1162 (2014). Edge testified as to his process of writing a letter to a defendant, reviewing the case, and listing issues for appeal before writing the appellate brief. The brief is then reviewed by a supervisor. Thus, the district court essentially determined that Edge conducted a thorough investigation.

Moreover, we must judge the reasonableness of Edge's conduct on the facts of the particular case viewed as of the time of his conduct. See *Miller*, 298 Kan. at 931. At the time Edge reviewed Quezeda-Duran's case for appeal, he had the transcripts, which showed that McMaster requested continuances for reasons valid to his defense strategy and that Quezeda-Duran conceded to at least one of the extensions. It was not until after Quezeda-Duran filed his K.S.A. 60-1507 motion that he alleged that he did not understand that right. And even then, he does not allege that if he had fully understood those rights, he would not have agreed to the waiver.

More importantly, however, the district court determined that under the second prong of the ineffective assistance of counsel test, Quezeda-Duran could not show that there was a reasonable probability that appellate counsel would have been successful in raising this issue. See *Miller*, 298 Kan. at 930-31. Specifically, the district court concluded that it did "not believe petitioner would have been successful on appeal if these issues had been raised." In challenging this finding that Quezeda-Duran was not prejudiced by appellate counsel's failure to raise the issue, Quezeda-Duran argues:

> "As to the second prong of the test, there was a serious potential constitutional and statutory violation of speedy trial here, that was certainly not explained away by appellate counsel's conclusionary [*sic*] excuse that it was 'the best strategy.' What is striking here is that the Court's decision resulted in a fundamentally unfair result. The Petitioner, Mr. Quezeda-Duran, would urge this Court to find that the District Court erred in finding that appellate counsel was not ineffective."

11

It is not ineffective for appellate counsel to fail to raise an issue that has "serious potential." Instead, there must be a reasonable probability that the issue would have been successful on appeal. See *Miller*, 298 Kan. at 930-31. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. [Citations omitted.]" 298 Kan. at 934. Quezeda-Duran has not argued that his appeal would have been successful if Edge had argued that his speedy trial rights were violated.

In finding that Quezeda-Duran's speedy trial rights were not violated, the district court stated that Quezeda-Duran's testimony at the K.S.A. 60-1507 hearing that he did not remember the June 6, 2006, hearing was not credible given that he referenced the hearing in his K.S.A. 60-1507 motion. The district court also found not credible his testimony that no one discussed a delay in the trial with him. Quezeda-Duran takes exception to the district court's finding that his testimony was not credible. He maintains that he did not understand the implication of the waiver or the concept of speedy trial. Nevertheless, we cannot reweigh evidence or assess witnesses' credibility. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

The district court found that Quezeda-Duran's trial counsel had clear reasons for requesting additional time and agreeing to a waiver of Quezeda-Duran's speedy trial rights. Furthermore, the record was clear that Quezeda-Duran was present with an interpreter at the February 9, 2006, hearing at which Quezeda-Duran's trial counsel stated that Quezeda-Duran was waiving his statutory speedy trial rights, and Quezeda-Duran did not object or state any disagreement with that waiver. He was also present again on June 6, 2006, when trial counsel spoke with him for 10 minutes before requesting a continuance and waiver of statutory speedy trial rights. And although Quezeda-Duran did not have an interpreter present at that time, the record reveals that he spoke some English and his trial counsel spoke some Spanish.

12

Other than his own testimony, which the district court found not to be credible, Quezeda-Duran does not challenge any of these findings. Moreover, we find the evidence in the record to be sufficient to support the district court's finding that there was not a reasonable probability that the speedy trial issue would have been successful on appeal. We, therefore, conclude that the district court did not err in denying Quezeda-Duran's motion on the basis of ineffective assistance of appellate counsel.

*Failure to File Motion to Suppress*

Quezeda-Duran next argues that the district court erred in ruling that trial counsel was not ineffective for failing to file a motion to suppress. As stated previously, this issue presents mixed questions of fact and law, so we review the underlying factual findings for support by substantial competent evidence and the legal conclusions made from those facts de novo. *Bowen*, 299 Kan. at 343.

The test for ineffective assistance of trial counsel is only slightly different than the test for ineffective assistance of appellate counsel. To establish ineffective assistance of trial counsel, the defendant must establish (1) that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the United States Constitution, and (2) that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial. *Miller*, 298 Kan. at 929.

Judicial scrutiny of counsel's performance is highly deferential and requires consideration of all the evidence before the jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's

13

deficient performance, the outcome of the proceeding would have been different. A reasonable probability means a probability sufficient to undermine confidence in the outcome. *Miller*, 298 Kan. at 934.

In finding that McMaster's failure to file a motion to suppress was not ineffective assistance of counsel, the district court noted that decisions on which witnesses to call, what trial motions to make, and all other strategic and tactical decision are the exclusive province of counsel after consultation with the client. See *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). The district court then determined that McMaster's decision not to file a suppression motion was consistent with his trial strategy because trial counsel was able to elicit testimony from the officer who interviewed Quezeda-Duran about how he vomited all over the back of the patrol car while being transported to the police station, appeared very intoxicated, smelled of tequila and beer, staggered and had to be supported by officers while walking, and dozed off several times during the interview. The officer also testified that Quezeda-Duran had consumed a 30-pack of beer and 4 glasses of tequila and that he also ingested cocaine approximately 4 times that night. He testified that it was difficult to get a meaningful interview with Quezeda-Duran.

Here, Quezeda-Duran argues that the district court failed to state how not filing a motion to suppress the statements was consistent with McMaster's defense strategy because Quezeda-Duran contends that filing a motion to suppress could not have hurt his defense in any way. At the very least, the motion would have been denied, but McMaster would have been able to hear the witnesses' testimony and use it later to impeach the witnesses if the testimony changed at trial. Quezeda-Duran maintains that suppression of inculpatory statements would be a benefit no matter what the defense. He contends that the district court's statement that a motion to suppress would have been inconsistent with trial strategy was conclusory and not supported by substantial competent evidence. He argues that under any objective standard, this was ineffective performance by his counsel.

He also argues that it met the second prong of the ineffective assistance of counsel test because there were many advantages to filing a suppression motion.

Nevertheless, we must start with the presumption that McMaster's decision not to file a motion to suppress was proper. See *Kelly*, 298 Kan. at 970. Moreover, if counsel makes a strategic decision after a thorough investigation of the law and the facts relevant to the plausible options, then the decision is virtually unchallengeable. Strategic decisions made after a less-than-comprehensive investigation are reasonable only to the extent that the limited investigation is supported by reasonable professional judgment. *Cheatham*, 296 Kan. at 437 (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). If counsel lacks the information to make an appropriate decision due to lack of investigation, it is inappropriate to claim it was trial strategy. *Sola-Morales*, 300 Kan. at 887-88. The defendant bears the burden of showing that trial counsel's actions were not the product of strategy. 300 Kan. at 888.

Unfortunately, we do not have the benefit of reviewing testimony from McMaster regarding his investigation or his rationale for not filing a motion to suppress. However, Quezeda-Duran has the burden to show that McMaster's decision was not strategic. See 300 Kan. at 887. The fact that McMaster may have received some benefit by cross-examining the witnesses at the suppression hearing does not amount to ineffective assistance of counsel.

Quezeda-Duran fails to clarify what evidence McMaster should have moved to suppress or what grounds he could have advanced to argue that the evidence was suppressible. More importantly, he fails to show any prejudice as he does not explain how the outcome of the trial would have been different if McMaster had filed a motion to suppress. Specifically, he does not contend that a motion to suppress his statements to law enforcement would have been successful. The district court, therefore, properly concluded that trial counsel was not ineffective for failing to file a motion to suppress.

15

*Failing to Designate Expert*

Finally, Quezeda-Duran argues that counsel was ineffective for failing to call an expert witness on the effects of alcohol and drugs. The district court, however, determined that the effects of intoxication are within the common knowledge and experience of jurors. The district court stated that it failed to see how an expert on the effects of drugs and alcohol would have impacted the outcome of the case. The district court concluded that McMaster's decision regarding the expert witness was a reasonable and competent decision regarding trial strategy.

Quezeda-Duran argues that the district court's conclusion that intoxication was well within the common knowledge and experience of the jurors was conclusory and pure speculation by the court. He also contends that the district court's ruling lacked any findings to support it. Quezeda-Duran points out that his defense counsel's expert witness testified at the K.S.A. 60-1507 hearing that an intoxication expert would have been helpful on the issue of *Miranda* and on a suppression motion. Quezeda-Duran contends that an intoxication expert would have been pivotal for the stated defense of intoxication. He contends that he was prejudiced by his counsel's ineffectiveness because an expert could have provided support for his defense that he could not form the specific intent to commit murder and that the expert could have provided crucial evidence to argue for a lesser included offense instruction.

Again, we do not have testimony from McMaster stating whether he investigated the possibility of hiring a defense expert. However, we can consider the prosecutor's testimony from the K.S.A. 60-1507 motion in which she testified that jurors can understand intoxication and its effects without the need for expert testimony. And although Quezeda-Duran's expert testified at the K.S.A. 60-1507 hearing that she believed it was deficient for McMaster not to obtain an expert witness on intoxication, the Kansas Supreme Court has stated: "Even though experienced attorneys might

16

disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. [Citation omitted.]" *Flynn v. State*, 281 Kan. 1154, 1165, 136 P.3d 909 (2006).

Quezeda-Duran has not met his burden to prove that trial counsel's actions were not the product of strategy. He has also failed to show a reasonable probability that, but for McMaster's failure to obtain an expert witness on the effects of alcohol and drugs, the outcome of the proceeding would have been different. We, therefore, affirm the district court's decision.

Affirmed.